# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | Case No. 08 CR 653 |
| v. ) | |
| ) | Judge Joan B. Gottschall |
| LARRY VERDINO ) | |

## MEMORANDUM OPINION & ORDER

Defendant Larry Verdino, who is charged with receipt of child pornography in violation of 18 U.S.C. § 2252A(5)(A), has moved for a finding that he is incompetent to stand trial. Having reviewed expert reports and having heard testimony both from those experts and from Mr. Verdino, the court is not persuaded that he is competent to stand trial. Mr. Verdino has a basic factual understanding of the proceedings but lacks the requisite rational understanding. Specifically, the evidence indicates that he lacks the ability to consider the alternatives necessary to assist his lawyer in making the decisions that are indispensable to meaningful participation in a criminal trial.

### I. LEGAL STANDARD

As the parties agree, the test for competency comes from *Dusky v. United States*, 362 U.S. 402 (1960). *Dusky* teaches that a defendant is competent if he "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and "has a rational as well as factual understanding of the proceedings against him." 362 U.S. at 402. In a later case, the Court stated that competency depends on whether the defendant has "the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense . . . ." *Drope v. Missouri*, 420 U.S. 162, 171 (1975).

1

II. BACKGROUND

Larry Verdino is a 52-year-old man who has been diagnosed as a low-functioning, special-needs adult with limited cognitive abilities, a number of physical problems, and mild cerebral palsy. Except for a period after his arrest in which he was housed at the Metropolitan Correctional Center ("MCC"), where he was segregated for his own protection, Mr. Verdino has lived with his family since birth.

A. Expert Reports

Three experts provided forensic reports to the court concerning Mr. Verdino's competence, each finding Mr. Verdino to be significantly limited. Department of Justice Clinical Psychologist Ron Nieberding tested Mr. Verdino's intelligence on the Wechsler Adult Intelligence Scale-IV ("WAIS-IV"). (*See* Forensic Report: Addressing the Issue of Trial Competence, Mar. 7, 2009 ("Nieberding Rep.") 6.) On the WAIS-IV, Dr. Nieberding measured Mr. Verdino's IQ in a number of areas, including verbal comprehension, perceptual reasoning, working memory, and processing speed, and concluded that Mr. Verdino's full-scale IQ was 65, placing him in the first percentile of persons measured. Defense psychologist William Herman Hillman III measured Mr. Verdino's full-scale IQ as 71 and, as detailed further within, found that Mr. Verdino had specific limitations that would prove problematic at trial. (*See* Evaluation of Larry Verdino, Dec. 11, 2008 ("Hillman Rep. I") 7.) Psychiatrist Stephen H. Dinwiddie relied on the testing done by the two psychologists, but separately met with and evaluated Mr. Verdino, finding specific deficits in Mr. Verdino's knowledge of legal concepts.[1]

---

[1] The experts presented by the parties agreed that Mr. Verdino is intellectually impaired but expressed some reluctance to diagnose his condition. However, Dr. Hillman gave Mr. Verdino a diagnosis of "Mild Mental Retardation." (Competency to Stand Trial Examination of Larry Verdino, Apr. 22, 2009 ("Hillman Rep. II") 6.)

While the experts did not significantly disagree on the nature of Mr. Verdino's condition, they came to different conclusions concerning his competency to stand trial. Dr. Nieberding concluded, "[T]here [is] insufficient evidence to suggest Mr. Verdino is not competent to proceed to trial at the present time," Nieberding Rep. 11, assuming Mr. Verdino's needs are properly accommodated. Dr. Nieberding suggested that those needs might be accommodated by: encouraging Mr. Verdino to ask questions; making sure that verbal information provided to him is not "overly complex or abstract in nature," *id.*; and asking him to summarize information presented to him in order to ensure that his understanding is accurate. Defense expert Dr. Hillman also examined Mr. Verdino and found that "Mr. Verdino's performance on tests of memory and problem solving revealed significant impairment [in] his capacity to concentrate, resist distraction, and apply strategies to solve simple problems [which] abilities are affected by stress." (Hillman Rep. I, at 7.) Dr. Hillman concluded, "Based on his limitations, which have been verified from previous records, psychological testing, interviews with him, his mother, and family . . . Mr. Verdino is not competent to stand trial." (Hillman Rep. II, at 11.) Last, Dr. Dinwiddie concluded that Mr. Verdino is competent to stand trial. (*See generally* Letter from Stephen H. Dinwiddie, Dec. 10, 2009.) He stated, "Insight was felt to be modest. Judgment, based on history, was felt to be moderately impaired. Intellect was estimated as being substantially below average." (*Id.* 7.) Nevertheless, Dr. Dinwiddie found that Mr. Verdino was competent to stand trial due to his "generally accurate understanding of the nature of the legal process," his "motiv[ation] to assist in his defense," and proper courtroom behavior. (*Id.* 10.)

**B. Hearing**

All three experts testified at a hearing held on April 2, 2010. Like their reports, the experts' testimony revealed no substantial disagreement about Mr. Verdino's limitations or his unusually compliant, cooperative personality. Their dispute, rather, is whether, given Mr. Verdino's limitations, he has a rational and factual understanding of the proceedings sufficient to assist his lawyer. In other words, as Dr. Dinwiddie indicated, the experts disputed what cognitive capacity is necessary to stand trial, but not, to any significant degree, what capacity Mr. Verdino actually possesses.

Dr. Nieberding testified that in his opinion Mr. Verdino "demonstrated to me that he understood on a factual and rational level many of the issues related to the criminal proceedings and that he demonstrated clearly his ability to assist and engage in interaction, productive interaction with other people, and with his attorney, with some assistance." (Tr. 6.)[2] He continued:

> Based on his responses, they were relatively concrete and simplistic, but accurate, fundamentally. He understands, I believe, what the roles and responsibilities of the individuals involved in court proceedings are. I think he has the capacity to assist and engage in productive interaction with other people. He certainly was that way with me. I did not find anything in his responses that would indicate a significant problem in any of those three areas.[3]
>
> . . .
>
> Q: Regarding the judge, did Mr. Verdino say that the judge was the boss of the court?
>
> A: He did.
>
> Q: Regarding the defense attorney did Mr. Verdino tell you that the defense attorney he tells the judge, he tells my story, and

---

[2] Citations to "Tr.____" are to a draft of the transcript from the competency hearing.

[3] Mr. Nieberding identified the three areas as "three sections analogous to factual and rational understanding and ability to assist counsel." (Tr. 13.)

4

>               hopefully they will drop the case.
>
> A:    Yes.
>
> Q:    And with regard to the prosecuting attorney did he tell you that he is there to prosecute you, he wants you to be guilty?
>
> A:    Yes.
>
> Q:    . . . And were those responses part of why you gave us this more sort of general opinion about Mr. Verdino's, at least general understanding of what people do in court?
>
> A:    That's correct.

(*Id.* 13-14.)

Dr. Nieberding also gave Mr. Verdino an examination called the CAST-MR, which is designed to assist in the assessment of competency to stand trial of persons with low IQ levels. (*Id.* 16.) Mr. Verdino scored 100% on a test of basic legal concepts, but missed some items categorized as assisting defense. (*Id.* 17.) Based on this assessment, Dr. Nieberding expressed concern that Mr. Verdino would have difficulty coping with any complex information presented at trial, and, when asked to assist his counsel, might be "overwhelmed" by the emotional "gravity" of the trial. (*Id.* 18.) Dr. Nieberding suggested that the case be tried at a "slow pace," with breaks, with explanations to Mr. Verdino during the course of the proceedings with an opportunity for him to summarize what has been explained to him to ensure his understanding, since his habit of compliance might cause him to nod his head in agreement even when he does not understand.

Like Dr. Nieberding, Dr. Dinwiddie concluded that Mr. Verdino is competent to stand trial, but qualified his opinion in a number of significant ways. Dr. Dinwiddie concluded, "[M]y experience . . . in general . . . has been that people with these kind . . . of difficulties are found fit

to proceed. That is a different thing from saying they should be." (Tr. 55.)[4]

Dr. Dinwiddie pursued three lines of inquiry in assessing Mr. Verdino's competency to stand trial. First, Dr. Dinwiddie asked, "Does he have a good understanding of who the various people in the courtroom are and what they do. And I concluded pretty good." (*Id.* 45.) Dr. Dinwiddie's second question was, "[W]ould . . . he behave appropriately in the courtroom, will he be disruptive, things of that nature. And once again, I don't see that as being a close call. He was able to cooperate. He was able to attend to the process. He was not hostile, he was not agitated, things of that nature. So I have a great deal of comfort in that realm." (*Id.* 47.) Finally, in what he characterized as the "third area," Dr. Dinwiddie testified as follows:

> . . . The third area is, I think, where the greatest concern lies. And, again, my sense is that this is where everybody sort of agrees, once again, and that is the area of how well is he able to truly comprehend and manipulate the information to make decisions that are going to be in his best legal interest.
>
> Now, at one level, once again, I think this is something I'm quite comfortable with. If your standard is quite low, so are there any fixed false beliefs, any delusions that would say well, I know that the judge is really a Martian, so I can't–so I can't answer questions, no there is nothing like that.
>
> Is there any profound problem with what we call a disorder of thought form, is he profoundly illogical; no, I don't think there is a problem. But those are pretty minimal standards.
>
> *And I would obviously defer to the legal system as to whether that is what is meant with rational understanding of the process.*
>
> . . .
>
> *[W]e can highlight the concerns and difficulties, but the question is, is he above the minimal threshold or is he not. And*

---

[4] Dr. Dinwiddie testified that the universe of cases he was considering was a small sample of mostly state cases.

6

> *where to set the threshold I think is a function of the Court rather than mental health.*

(*Id.* 47-48 (emphasis added).)

Dr. Dinwiddie testified that Mr. Verdino's "more compliant than average" personality, *id.* 51, concerned him because Mr. Verdino is likely to indicate understanding when he has none. (*Id.*)[5] In sum, Dr. Dinwiddie called the instant case a "tough[,] borderline case[.]" (Tr. 53.) As to the other doctors, he stated, "I think that we have no disagreement that he's got more difficulties than average." (*Id.* 54.)

Dr. Hillman testified that to a large extent he agreed with Dr. Nieberding and Dr. Dinwiddie, but reached a different conclusion, namely, that Mr. Verdino is not competent to stand trial. Dr. Hillman first focused on the fact that Mr. Verdino has never demonstrated a capacity to live independently or to make major decisions about his own life, such as obtaining health care, buying groceries, or managing a bank account. His mother manages his medical needs, including the scheduling of his doctor appointments. She is the payee for Mr. Verdino's Social Security checks and gives him a debit card, since he is unable to manage cash, a budget or a bank account. He has always lived with his family. According to Mrs. Verdino, "[W]ithout supervision, he would not be capable of locating, negotiating, and renting a place to live." (Hillman Rep. II, at 4.)

Dr. Hillman listened to Mr. Verdino testify at this hearing and noted that Mr. Verdino was focused on only two things: whether he will have to return to jail and whether he will be a registered sex offender. He observed that Mr. Verdino has difficulty maintaining competing concepts in his mind at the same time, maintenance that in psychology is called "set-changing

---

[5] Dr. Dinwiddie assumed that there are limits to Mr. Verdino's compliance, so that if he were told to open a window and jump out, he might not do it. (Tr. 51-52.)

capacity." (Tr. 78.) Dr. Hillman explained that a person who lacks set-changing capacity is unable to take a "contrary-to-fact position," and so, for example, would be unable to understand that any resolution other than a guilty plea is possible if he is in fact guilty. (*Id.*) Dr. Hillman testified that Mr. Verdino has demonstrated no set-changing capacity and further noted that Mr. Verdino is "primitive in his problem-solving abilities and childlike. . . . [H]e has difficulty making decisions that involve conflicting information and is apt to make a decision on emotion rather than logical or reasoned problem solving." (*Id.*) He agreed with Dr. Dinwiddie that the case was "borderline." (*Id.* 79.) He continued:

> A: . . . [I]t comes down to an individual who is, who lacks sufficient maturity or cognitive capacity to make complex decisions. He's never demonstrated that capacity because his mother is the payee for his Social Security benefits, he doesn't manage his bank account and he doesn't manage his medical needs. His mother manages all that for him. So that's basically where we're differing.
>
> Q: And that's very important – that's a central foundation of your opinion, that not to be able to function with simple, day-to-day tasks, like feeding the cats, suggests that he just doesn't have the capacity to deal with the complexities of a federal criminal prosecution?
>
> A: That's correct.

(*Id.* 80.)

Mr. Verdino has never been involved romantically with another person. He has never traveled or lived away from his family (until, as noted above, his incarceration at the MCC, where he was segregated for his own protection). Because he has been teased by peers, he prefers the company of his family, and he has had no sustained social involvement outside his family. He spent little time in school, and has never had a paying job; indeed, he stopped attending a sheltered

8

workshop, the purpose of which was to prepare him for employment, complaining of mistreatment.

## III. ANALYSIS

As stated above, the question in determining competency is whether Mr. Verdino has both the "ability to consult with his lawyer with a reasonable degree of rational understanding" and "a rational as well as factual understanding of the proceedings against him." *Dusky*, 362 U.S. at 402; *see also Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996) (citing *Dusky*); *United States v. Ewing*, 494 F.3d 607, 622 (7th Cir. 2007) (same). This competency standard is codified at 18 U.S.C. § 4241(d), which tasks a court, similarly to the *Dusky* standard, with determining whether a preponderance of the evidence supports a finding that the defendant is unable "to understand the nature and consequences of the proceedings against him" or "to assist properly in his defense." 18 U.S.C. § 4241(d). Upon the presentation of evidence demonstrating that reasonable cause exists to believe that the defendant is incompetent to stand trial,[6] the government bears the burden of establishing competency by a preponderance of the evidence. *United States v. Teague*, 956 F.2d 1427, 1431 & n.10 (7th Cir. 1992) (citing, *inter alia*, *United States ex rel. S.E.C. v. Billingsley*, 766 F.2d 1015, 1023 (7th Cir. 1985)).

The *Dusky* competency standard applies equally to a defendant's competency to stand trial and his competency to waive significant constitutional rights, such as the right to defense counsel. *See Godinez v. Moran*, 509 U.S. 389, 396-98 (1993). While the standard for waiving trial rights is well-known–the plea of guilty must be free, voluntary and intelligent–it was not clear before *Moran* that competency to stand trial required equivalent cognitive capacity. However, in *Moran*,

---

[6] The parties have not suggested that there is insufficient evidence demonstrating reasonable cause in this case; given the experts' disagreement about Mr. Verdino's competence to stand trial, the court finds that sufficient evidence demonstrating such reasonable cause exists.

the Supreme Court closely examined the choices that a defendant must make in a trial and found that those choices were as complex and important as the decisions necessary to waive the right to trial. Because the necessary choices are equally complex at each stage, the competency standard also must be the same. The Court reasoned, "A defendant who stands trial is likely to be presented with choices that entail relinquishment of the same rights that are relinquished by a defendant who pleads guilty . . . ." *Id.* at 398. Such choices include whether to waive one's right against self-incrimination and instead testify, whether to waive one's right to trial by jury, whether to waive one's right to confront one's accusers, and whether to present a defense or an affirmative defense. Indeed, while not discussed in *Moran*, the choice of whether to plead guilty or go to trial has taken on added importance under the Federal Sentencing Guidelines: a defendant must be able to weigh the strength of the government's case against his significant sentencing advantage if he admits guilt. *See* U.S. Sentencing Guidelines Manual § 3E1.1 (decreasing offense level for defendant's acceptance of responsibility). In this case, in which the defendant is charged with possession of child pornography, he must weigh significant collateral consequences along with the potential sentence and the direct consequences of a felony conviction. Because "the decision to plead guilty . . . is no more complicated than the sum total of decisions that a defendant may be called upon to make during the course of a trial," *Moran*, 509 U.S. at 398, there is no basis for requiring a different level of competency for a plea of guilty as opposed to a trial. *Id.* at 399.

In light of *Moran,* the Seventh Circuit has made clear that while the competency test is unitary (meaning the same in varying proceedings), "its application will depend on the circumstances." *Holmes v. Buss*, 506 F.3d 576, 579 (7th Cir. 2007). The district court must look at both the litigant's particular mental condition and the nature of the decisions that he will be

called upon to make. *Id.* Engaging in the same case-specific analysis, the Seventh Circuit in *Holmes v. Levenhagen*, 600 F.3d 756 (7th Cir. 2010), emphasized that the nature of the competency question "depends on the nature of the decisions that [the defendant] and his lawyers have to make . . . ." *Id.* at 758. While technical questions that turn on "esoteric points of law" may properly be made by the lawyer, strategic and tactical questions are more mixed, and the client may have something important to contribute. *Id.* As in *Levenhagen*, in which the Seventh Circuit observed that in a habeas corpus petition the question of whether to plead incompetence or "go for broke" is critical and requires input from the client, *id.*, the decision of whether to plead guilty or go to trial is of fundamental importance in a criminal proceeding and requires that the defendant possess the cognitive capacity to assist the lawyer in making this decision. Indeed, the ultimate decision of whether or not to plead guilty must be the defendant's, *see Jones v. Barnes*, 463 U.S. 745, 751 (1983), and the defendant must have the ability to weigh the alternatives in order to make such a decision on a rational basis.

The evidence in the case at bar indicates that Mr. Verdino understands the factual basis of the proceedings against him. As expert examination and testimony have revealed, Mr. Verdino has been able to learn simple things like the roles of the judge, the prosecutor and the defense attorney. He clearly knows both the crime with which he is charged and the wrongfulness of his alleged conduct (at the hearing, he insisted on calling the charge "CP," explaining that "child pornography" was a bad thing to say, *see* Tr. 65). He is able to behave properly in a public forum.

However, Mr. Verdino lacks a rational understanding of the proceedings. He specifically has shown no ability adequately to consider the alternatives, discussed in *Moran* and *Levenhagen*, that will present themselves should he be found competent. In order to decide whether to go to trial

or to plead guilty, Mr. Verdino must be able to weigh, at minimum, the consequences that would result from a plea of not guilty, such as the presentation of his case to a jury and any sentence he may receive upon a jury verdict of guilty, against the consequences resulting from a guilty plea, including perhaps lesser but more certain punishment. This calculus, even reduced to its most basic form, is beyond Mr. Verdino's demonstrated capacity. For example, while Mr. Verdino has made no secret of his desire to "take the plea," *see* Tr. 74, he does not want to register as a sex offender, *see id.* 71, and has not demonstrated any recognition that pleading guilty is inseparable from sex offender registration. Nor has he shown any ability to reconcile the inconsistency between his stated desire to avoid sex offender registration, which would result from a guilty plea, and his equally clear desire not to go to trial, which would result from a plea of not guilty, because he does not "want people to know my business." (*Id.* 69.) Also, should Mr. Verdino go to trial, the law requires him to choose whether or not to testify. In this respect, the submitted evidence indicates that he would follow his lawyer's advice, *see, e.g.*, Tr. 32, due to his compliant nature, rather than based on any independent decision-making.

Based on the available record, Mr. Verdino also would be unable to contribute to his defense. While Mr. Verdino clearly understands that the prosecutor is his opponent, he seems unable to understand why the prosecutor might describe the case in ways that Mr. Verdino believes are untrue; that is, he has shown no ability to understand the concept of rhetoric or argument. Nor does he appear to understand testimony: at the competency hearing, he was unable to describe any aspect of Dr. Nieberding's testimony, and testified that he had "no idea" whether Dr. Neiberding was "on [his] side." (*Id.* 72.) In other words, were this case to proceed to trial, Mr. Verdino's "ability to participate in a defense strategy [and] provide his attorney with pertinent information . . . would be

12

significantly impaired." *See United States v. Frazier*, 255 F. Supp. 2d 27, 32 (D. Conn. 2001) (concluding that defendant was not competent to stand trial).

Dr. Hillman persuasively addressed each of Mr. Verdino's specific mental limitations and explained how those limitations would interfere with Mr. Verdino's ability to assess the weight of the evidence, rationally weigh the advantages and disadvantages of pleading guilty or going to trial, and make the decisions a trial would require. Dr. Hillman concluded that the limitations that have precluded Mr. Verdino from achieving even minimal independence from his family would likewise prevent him from meaningfully consulting with counsel at trial. By contrast, Dr. Dinwiddie explicitly excluded from his opinion consideration of what kind of decisions Mr. Verdino would be required to make during the course of this case, and Dr. Nieberding focused exclusively on Mr. Verdino's ability to identify courtroom players and to behave properly in a courtroom. The court has no doubt that Dr. Nieberding's observations of Mr. Verdino were accurate. However, Mr. Verdino's observed abilities are neither equivalent to nor a substitute for the ability to meaningfully participate in his defense, to weigh and consider important choices, to understand the costs and the benefits of alternative ways of proceeding or to understand set-changing concepts, such as the presumption of innocence and the related constitutional right to choose to go to trial even if one is guilty. The court has confidence that Mr. Verdino's lawyer, Mr. Morris, would do his best to make the right decisions for Mr. Verdino. Yet Mr. Verdino must be able to make such decisions for himself, and he is not competent to do so.

## IV. CONCLUSION

The court concludes that Mr. Verdino is not competent to stand trial. It further finds that since Mr. Verdino's incompetency is the result of mental retardation, not insanity, he is unlikely

13

ever to improve. While patient tutoring might increase his familiarity and comfort with the trial process, there is nothing in the record to suggest that his assessment capacity or set-changing capacity can be improved.[7]

ENTER:

　　　　　　　　　　　　　　　　/s/　　　　　　　　　　　　　　　
JOAN B. GOTTSCHALL
United States District Judge

DATED: May 14, 2010

---

[7] The parties are directed to contact the courtroom deputy to schedule a status hearing. In preparation for the hearing, the parties should familiarize themselves with 18 U.S.C. § 4241(d) and *United States v. Shawar*, 865 F.2d 856 (7th Cir. 1989).