**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| United States of America | ) | |
| | ) | Case No.: 08-cr-0653 |
| v. | ) | |
| | ) | Honorable Joan B. Gottschall |
| Larry Verdino | ) | |

## MEMORANDUM OPINION AND ORDER

The court must determine for the second time in this case whether defendant Lawrence

(Larry) Verdino, a 63-year-old man diagnosed with intellectual and physical disabilities, is

competent to stand trial. A competency hearing was held via video and teleconferencing (due to

the COVID-19 pandemic) on March 3, 2021. Two experts testified, Dr. Diana S. Goldstein and

Dr. William Hillman, and the parties have submitted post-hearing briefs.

### I. Competency Standard

The Supreme Court articulated the test of a criminal defendant's competency in *Dusky v.*

*United States*, 362 U.S. 402 (1960) (per curiam). The question under *Dusky* is whether

Mr. Verdino "has sufficient present ability to consult with his lawyer with a reasonable degree of

rational understanding—and whether he has a rational as well as factual understanding of the

proceedings against him." 362 U.S. at 402. The *Dusky* competency inquiry has two distinct

components: "(1) 'whether' the defendant has 'a rational as well as factual understanding of the

proceedings against him' and (2) whether the defendant 'has sufficient present ability *to consult*

*with his lawyer* with a reasonable degree of rational understanding.' " *Indiana v. Edwards*,

554 U.S. 164, 170 (2008) (quoting *Dusky*, 362 U.S. at 402) (numbering and emphasis in

original). "The due-process rule announced in *Dusky* has deep common-law origins and

implements the fundamental principle that it is unjust to punish a person who lacks the mental

capacity to understand the proceedings against him and participate in his own defense."
*McManus v. Neal*, 779 F.3d 634, 656 (7th Cir. 2015) (citing *Drope v. Missouri*, 420 U.S. 162, 171
(1975)). The federal statute governing competency determinations mirrors the *Dusky* standard.
*See* 18 U.S.C. § 4241(d). As the Seventh Circuit has explained, "Judges, who are untrained in
medical terminology, base their [competency] decisions upon explanations of a defendant's
symptoms, not upon medical jargon." *Smith v. United States*, 996 F.2d 1219 (7th Cir. 1993)
(unpublished table decision). Technical medical information must be tied to the incompetency
standard. *See United States v. Chiappetta*, 289 F.3d 995, 1000 (7th Cir. 2002).

The *Dusky* standard is vague, and its vagueness has plagued these proceedings for over a
decade. What does it mean for the defendant to have a "rational" as well as a "factual"
understanding of the proceedings against him, and what does it mean for him to consult with his
lawyer with a reasonable degree of rational understanding?[1] Perhaps even more relevant here,
how can the court, listening to a group of doctors who know very little about what goes on in the
trial of a case; what the factual, legal, and procedural disputes involved in this case are; and the
complexities caused by the multiple layers of charges Mr. Verdino faces form an opinion about
what a lawyer in this case needs from his client? And what does all this mean for an individual
like Mr. Verdino, whom all experts agree has slow verbal processing speed, memory deficits, and
a dependent and compliant personality, meaning that he will consistently defer to his lawyer
rather than trying to make his own decisions, even if he were capable of doing so? Not for
nothing did the experts at the first competency hearing dispute "what cognitive capacity is

---

[1] The Butner "restoration" process, referred to at length below, seems to have been aimed, at least in Mr. Verdino's case, at increasing his factual understanding by providing him with more familiarity with legal terms and courtroom players. How, if at all, this "restoration" process affected his "rational" understanding or ability to assist his lawyer has never been satisfactorily explained.

necessary to stand trial, but not, to any significant degree, what capacity Mr. Verdino actually possesses." *Verdino I,* 2010 WL 1979428, at *2.

## II. Factual and Procedural Background

Now 63 years old, Mr. Verdino has been diagnosed with physical and intellectual disabilities since he was a child. *See* Ridgeway Hospital Discharge Summary ("Ridgeway Report") at 1, June 26, 1970, ECF No. 13 attachment. As a child, Mr. Verdino received diagnoses of cerebral palsy, strabismus, and Legg-Perthe's disease, *id.*, a rare childhood condition affecting the hip joint. As a result of the latter condition, Mr. Verdino used crutches as a child. *Id.* Today he walks slowly with the assistance of a cane and has difficulty rising from a sitting position. Goldstein Report at 31, Sept. 13, 2020, Gov't Ex. 2, ECF No. 167. In 1964, the University of Illinois Pediatric Service diagnosed brain damage. Ridgeway Report at 1. Today, Mr. Verdino receives care for diabetes, neuropathy, serious dental problems and cerebral palsy. *See* 2019 Hillman Report at 6, Aug. 7, 2019, Def. Ex. 4, ECF No. 172.

The extent of Mr. Verdino's cognitive and adaptive impairments is disputed, but there has never been any dispute that he is impaired. 4/2/2010 Tr. at 3; 3/3/2021 Tr. at 51–52, ECF No. 166 (testimony of Dr. Goldstein); Goldstein Report at 52. Mr. Verdino's impairment came to school officials' attention early. *See* Goldstein Report at 7–8. Chicago Public Schools ("CPS") officials placed Mr. Verdino in special education classes as early as the first grade. *See* Ridgeway Report at 1. Sometime before 1970, probably in 1968, CPS officials determined that they could not find a suitable placement accommodating Mr. Verdino's disabilities. *See id.* at 2; Undated Letter from George W. Connelly, Assoc. Superintendent, ECF No. 68-1; Mot. to Appoint Expert ¶ 1, ECF No. 7. When Schubert School, which Mr. Verdino had been attending, refused to accept him back into the EMH program, a school called Montefiore was recommended, but

Mrs. Verdino, as well as the Ridgeway doctors, opposed this recommendation. Ridgeway Report at 2.

It is unclear exactly when Mr. Verdino stopped attending school. *See* Goldstein Report at 7–8; Butner Report at 3, Mar. 7, 2011. He and his mother reported that he attended a sheltered workshop, most likely in his teens, but he left within a few weeks because he was being bullied. *See* Goldstein Report at 8; 2009 Hillman Report at 4–5, Apr. 22, 2009, Def. Ex. 3, ECF No. 171.

In 1970, at age 12, Mr. Verdino underwent two weeks of psychiatric, psychological, and social evaluations at Chicago's former Ridgeway Hospital. The attending physician summarized the results in a discharge report referred to in this decision as the Ridgeway Report. *See* ECF No. 13 attachment.

According to the Ridgeway Report, Mr. Verdino was a "very friendly" small child, but he became isolated because he could not speak well, was cross-eyed and used crutches. Ridgeway Report at 2. His family, particularly his father, lacked an understanding of his needs. *See id.* After being taunted and called a "retard" by neighborhood children, Mr. Verdino became a "loner" who usually retreated to his room to listen to music and tinker with radios. *Id.* From first grade, he was hyperactive, aggressive, and destructive, and early on was placed in an EMH classroom, but he was quickly removed for further evaluation after more disruptive behavior. *Id.*

On the Wechsler Intelligence Scale for Children,[2] Mr. Verdino at that time tested as having an overall intelligence quotient ("IQ") score of 74 with a performance IQ of 74 and

---

[2] As noted in Dr. Goldstein's report, different instruments have been used at various times to measure Mr. Verdino's IQ score: the Wechsler Intelligence Scale for Children (WISC) and the third and fourth editions of the Wechsler Adult Intelligence Scale (WAIS-3 and WAIS-4). Goldstein Report at 8–9. Dr. Goldstein states that all three scores "generally represent the same constructs and are highly correlated." *Id.* at 9. As discussed *infra* in the text, Dr. Goldstein holds the opinion that IQ scores underestimate Mr. Verdino's intellectual capabilities because their measurement was affected by other issues such as his cerebral palsy and adaptive functioning deficits. Goldstein Report at 68–75, App. 1. Except where necessary, IQ scores are reported in this opinion without specifying the test used to obtain the score.

verbal IQ of 54. *Id.* The Ridgeway Report noted significant subtest "scatter," concluding that while "there were clear limitations of intellectual functioning," Ridgeway Report at 2, his actual IQ could be higher than the scores indicated. *Id.* The government's expert, Dr. Goldstein, partially disputes the validity and significance of Mr. Verdino's IQ scores, but she and the expert called by Mr. Verdino, Dr. Hillman, agree that Mr. Verdino's cognitive abilities have been stable since 1970. *See* 3/3/2021 Tr. at 52–53, 61–62, 104–05; Goldstein Report at 8–11.

The attending physician who evaluated Mr. Verdino in 1970 noted that Larry "tends to be limited to extremely concrete thinking" and had "limited capacity for internalization and symbolization." Ridgeway Report at 2–3. "Abstract verbal material," the report concludes, "will always be difficult if not impossible for him, and exposure to it should be limited to simple facts which he needs to learn . . . ." *Id.* at 3.

An IQ score of 75 or less generally raises serious concerns that a person is intellectually disabled. *See Brumfield v. Cain*, 576 U.S. 305, 315–16 (2015). Mr. Verdino's IQ has been tested on four subsequent occasions—all in connection with this case. *See* Goldstein Report at 8. Each time, he has achieved a full-scale IQ score between 65 and 71. *Id.* The two most recent IQ tests (2011 and 2019) resulted in a score of 67. *Id.*

Mr. Verdino has never had a paying job. *See* 2009 Hillman Report at 4. He has never lived away from the close supervision of his family, except for the periods of incarceration ordered in this case. *Id.* Mr. Verdino's mother and sister have continued to support him in basic daily living tasks after he was forced to move to his own apartment in Chicago's Belmont Cragin neighborhood due to his sex offender registration (a day care center moved into the neighborhood where his mother lived). They do his grocery shopping, perform housekeeping tasks, and manage his finances. 2019 Hillman Report at 6. Mr. Verdino's mother is the payee for

his social security check. *Id.* at 4. She does not give Mr. Verdino cash "due to concerns about his poor judgment and safety." *See* 2009 Hillman Report at 4; 2019 Hillman Report at 5, 10. Mr. Verdino cannot write well enough to fill out a check, and he does not have the math skills needed to make change or balance a checking account. 2009 Hillman Report at 5; 2019 Hillman Report at 4, 5. His mother and sister manage his medical care because he cannot do so himself. 2009 Hillman Report at 3–4; 2019 Hillman Report at 7.

### A. Arrest and Detention in 2008

Mr. Verdino was arrested in 2008 on a charge of possessing child pornography and was subsequently indicted. *See* Compl., Aug. 15, 2008, ECF No. 1; Indictment, June 30, 2009, ECF No. 51; 18 U.S.C. § 2252A(a)(5)(B) (charged offense). A magistrate judge ordered Mr. Verdino held without bond on September 10, 2008, ECF No. 10, and he was incarcerated for ten months in Chicago's Metropolitan Correctional Center ("MCC").

MCC officials separated Mr. Verdino from the general prisoner population for his own protection. Mr. Verdino later testified that another inmate attacked him and struck him in the face. 5/3/2011 Tr. at 97.[3] During his MCC stay, Mr. Verdino wrote several letters to his mother and other family members. The letters were before the court at Mr. Verdino's first competency hearing. *See* ECF No. 68 (affidavit of defendant's mother and letters).

The letters are printed in all capitals. Almost no punctuation is used. The letters contain numerous misspellings, grammatical errors, and crossed out words. Many times, Mr. Verdino repeatedly crosses out the same word as he apparently tries to work out how to spell it. Examples include misspelling the word "check" and conflating the words "no" and "know." *See* ECF No. 68-11.

---

[3] Citations to the transcripts of the hearings held May 3 and August 9, 2011, refer to draft transcripts prepared for the court.

Mr. Verdino's letters from the MCC reflect his preoccupation with going home, ensuring that someone cared for his cats, and obtaining a radio in order to listen to music. *See* ECF Nos. 68-4, 68-5, 68-6, 68-11, 68-12, 68-13. Notably, Mr. Verdino repeatedly looked to family members to manage his representation. Time and again he asked his mother and sister to speak to his lawyer about setting a court date so that he could be released. He did not appear to understand that, as the client, he has the right to contact his attorney and make his wishes known. Mr. Verdino does not appear to have appreciated his case's procedural posture at the time. *See* ECF Nos. 68-4, 68-5, 68-9, 68-11, 68-12, 68-13. On the contrary, Mr. Verdino stated at one point that he promised his lawyer $500 "only if he if won [sic] my case." ECF No. 68-5. There is no indication that Mr. Verdino grasped the fact that the court appointed a lawyer to represent him because he is unable to afford a lawyer.

In a letter to MCC officials, Mr. Verdino's attorney, Gareth Morris, described his client as despondent and possibly suicidal. ECF No. 13 at 1. Mr. Verdino's letters support his lawyer's statement. He repeatedly describes feelings of intense despair and loneliness. *See* ECF Nos. 68-4, 68-5, 68-6, 68-10, 68-11, 68-12, 68-13. In separate letters, he sent his mother two sets of different instructions on how his personal property should be distributed in the event of his death. *See* ECF Nos. 68-9, 68-13. Mr. Verdino expressed a desire to die on more than one occasion, stating he would like to go to live with his deceased father rather than continue to be held at the MCC. ECF Nos. 68-6, 68-12.

### B. Initial Competency Evaluations and Hearing

Questions concerning Mr. Verdino's mental capacity arose shortly after his arrest. Mr. Morris filed a motion on September 10, 2008, seeking the appointment of Dr. William Hillman to perform a psychological evaluation of Mr. Verdino to assist in assessing

his risk to the community if he were placed on home detention. ECF No. 7. Dr. Hillman, a licensed clinical psychologist (Def. Ex. 1 at 1, ECF No. 169), met with Mr. Verdino, performed psychological testing, and gathered information from his mother, sister, and the case agent. Dr. Hillman prepared a risk assessment report dated December 11, 2008 ("2008 Hillman Report"). Def. Ex. 2, ECF No. 174. Dr. Hillman measured Mr. Verdino's full-scale IQ at 71, placing him at the "low end of the range for borderline intellectual function." *Id.* at 7. Dr. Hillman wrote that Mr. Verdino's verbal IQ score was "consistent with severe limitations in acquiring, understanding, and use of verbal information. Low Verbal scores reflect limited abilities for logic and abstract reasoning." *Id.* Dr. Hillman also opined, "Mr. Verdino's performance on tests of memory and problem solving revealed significant impairment [of] his capacity to concentrate, resist distraction, and apply strategies to solve simple problems. These abilities are affected by stress." *Id.*

Based on the 2008 Hillman report and his interactions with Mr. Verdino, Mr. Morris filed a motion for a continuance in which he stated that he had concluded that "Larry Verdino may not be able to participate in his defense, to understand the legal process, or to make necessary decisions." ECF No. 19 at 1. Mr. Morris explained, "I do not think he understands what a preliminary hearing is, or the considerations involved in waiving it." *Id.* Mr. Morris sought a continuance of the then-pending preliminary hearing until competency issues could be addressed. *Id.* at 2. The continuance was granted. ECF No. 21.

The government formally moved for a competency determination on December 29, 2008. ECF No. 22 at 3; *see* 18 U.S.C. § 4241(a). Three court-appointed experts ultimately evaluated Mr. Verdino and submitted reports: Dr. Hillman; Department of Justice licensed clinical psychologist Ron Nieberding; and University of Chicago psychiatrist Stephen H. Dinwiddie. *See*

ECF Nos. 25, 39, and 61 (orders appointing experts). During the evaluation period, Mr. Morris maintained that he harbored serious concerns about Mr. Verdino's ability to assist with his defense. *E.g.*, Mot. for Second Evaluation at 2, ECF No. 38. With competency evaluations ongoing, the government and Mr. Verdino's attorney reached an agreement in May 2009 for Mr. Verdino to be released on bond into his mother's custody. *See* ECF No. 45; Order Setting Conditions of Release, ECF No. 47 (placing Mr. Verdino on home confinement with electronic monitoring).

The first competency hearing was held April 2, 2010. All three experts and Mr. Verdino testified.

The court's May 2010 opinion finding Mr. Verdino incompetent describes the evidence in detail. *See Verdino I,* 2010 WL 1979428, at *1–5. The court summarized the experts' reports as follows:

> While the experts did not significantly disagree on the nature of Mr. Verdino's condition, they came to different conclusions concerning his competency to stand trial. Dr. Nieberding concluded, "[T]here [is] insufficient evidence to suggest Mr. Verdino is not competent to proceed to trial at the present time," Nieberding Rep. 11, assuming Mr. Verdino's needs are properly accommodated. Dr. Nieberding suggested that those needs might be accommodated by: encouraging Mr. Verdino to ask questions; making sure that verbal information provided to him is not "overly complex or abstract in nature," *id.*; and asking him to summarize information presented to him in order to ensure that his understanding is accurate. Defense expert Dr. Hillman also examined Mr. Verdino and found that "Mr. Verdino's performance on tests of memory and problem solving revealed significant impairment [in] his capacity to concentrate, resist distraction, and apply strategies to solve simple problems [which] abilities are affected by stress." (Hillman Rep. I, at 7.) Dr. Hillman concluded, "Based on his limitations, which have been verified from previous records, psychological testing, interviews with him, his mother, and family . . . Mr. Verdino is not competent to stand trial." (Hillman Rep. II, at 11.) Last, Dr. Dinwiddie concluded that Mr. Verdino is competent to stand trial. (*See generally* Letter from Stephen H. Dinwiddie, Dec. 10, 2009.) He stated, "Insight was felt to be modest. Judgment, based on history, was felt to be moderately impaired. Intellect was estimated as being substantially below average." (*Id.* 7.) Nevertheless, Dr. Dinwiddie found that Mr. Verdino was competent to stand trial due to his "generally accurate

understanding of the nature of the legal process," his "motiv[ation] to assist in his defense," and proper courtroom behavior. (*Id.* 10.).

*Verdino I*, 2010 WL 1979428, at *2 (alterations in original).

At the first competency hearing, the three experts disputed "what cognitive capacity is necessary to stand trial, but not, to any significant degree, what capacity Mr. Verdino actually possesses." *Id.* This court determined that "Mr. Verdino has been able to learn simple things like the roles of the judge, the prosecutor and the defense attorney. He clearly knows both the crime with which he is charged and the wrongfulness of his alleged conduct." *Id.* at *6. But the court concluded that Mr. Verdino "lack[ed] a rational understanding of the proceedings" and "would be unable to contribute to his defense." *Id.* at *6–7. Based on the reports and Mr. Verdino's testimony, weighing the tradeoffs and risks involved in deciding whether to plead guilty was "beyond Mr. Verdino's capacity," even when the decision is reduced to its most basic form. *Id.* at *6. The evidence also showed that Mr. Verdino would follow his lawyer's advice on whether to testify rather than make the decision independently, as he must do. *See id.*

This court found that Mr. Verdino is unable to assist with his defense because:

> While Mr. Verdino clearly understands that the prosecutor is his opponent, he seems unable to understand why the prosecutor might describe the case in ways that Mr. Verdino believes are untrue; that is, he has shown no ability to understand the concept of rhetoric or argument. Nor does he appear to understand testimony: at the competency hearing, he was unable to describe any aspect of Dr. Nieberding's testimony, and testified that he had "no idea" whether Dr. Neiberding was "on [his] side."
>
> . . . .
>
> Dr. Hillman persuasively addressed each of Mr. Verdino's specific mental limitations and explained how those limitations would interfere with Mr. Verdino's ability to assess the weight of the evidence, rationally weigh the advantages and disadvantages of pleading guilty or going to trial, and make the decisions a trial would require. Dr. Hillman concluded that the limitations that have precluded Mr. Verdino from achieving even minimal independence from his family would likewise prevent him from meaningfully consulting with counsel at trial. By contrast, Dr. Dinwiddie explicitly excluded from his opinion consideration of what

10

kind of decisions Mr. Verdino would be required to make during the course of this case, and Dr. Nieberding focused exclusively on Mr. Verdino's ability to identify courtroom players and to behave properly in a courtroom. . . . Mr. Verdino's observed abilities are neither equivalent to nor a substitute for the ability to meaningfully participate in his defense, to weigh and consider important choices, to understand the costs and the benefits of alternative ways of proceeding or to understand set-changing concepts, such as the presumption of innocence and the related constitutional right to choose to go to trial even if one is guilty. The court has confidence that Mr. Verdino's lawyer, Mr. Morris, would do his best to make the right decisions for Mr. Verdino. Yet Mr. Verdino must be able to make such decisions for himself, and he is not competent to do so.

*Verdino I*, 2010 WL 1979428, at *7 (brackets in original).

The court adopted Dr. Hillman's definition of set-changing capacity as meaning a person's ability to take a contrary to fact position. *Id.* at *4 (summarizing testimony of Dr. Hillman). As explained by Dr. Hillman at the first competency hearing, a person who lacks set-changing capacity would be unable, for example, to understand that any resolution of criminal charges other than a guilty plea is possible if the defendant is in fact guilty. *Id.* (citing 4/2/2010 Tr. at 78).

Dr. Goldstein defined "set-changing" differently: "a type of executive functioning that reflects one's capacity to divide attention between two competing stimuli, and to persevere in doing so without 'losing set' or demonstrating 'cognitive inflexibility' by perseverating on one type of information, or on one's approach to problem-solving despite feedback the approach is incorrect." Goldstein Report at 55. Her report states that Mr. Verdino's "verbal and nonverbal problem-solving and abstract reasoning performances are all normal." *Id.*[4] She references Dr. Hillman's findings of "impaired verbal subtests from the WAIS-III as reflecting 'set-changing' ability," but states that "none of the tests in the WAIS-III assesses set-changing capacity . . . ." *Id.* She does, however, acknowledge Mr. Verdino's "moderately to severely

---

[4] Elsewhere in her report, Dr. Goldstein stated that Mr. Verdino's verbal abstraction ability was "low average." Goldstein Report at 52.

impaired information processing speed" and "the slow speed with which he processes information." *Id*. at 56. She attributes this, however, to his cerebral palsy and to the fact that he lost so much formal schooling; she does not attribute his impairments, therefore, to lack of cognitive ability but at the same time does not deny that they afflict him at the present time. *Id*. at 56.

Based on its observations of Mr. Verdino and after weighing the evidence, this court agreed with Dr. Hillman's assessment that Mr. Verdino lacked the ability to hold two or more counter-factual positions simultaneously and "is primitive in his problem-solving abilities and childlike. He has difficulty making decisions that involve conflicting information and is apt to make a decision on emotion rather than logical or reasoned problem solving." *Verdino I,* 2010 WL 1979428, at *4*. (quotation and alterations omitted); *but see* Goldstein Report at 55–56 (partially disputing Dr. Hillman's definition of "set-changing capacity"); 3/3/2021 Tr. at 44–46 (effectively same). Dr. Hillman relates his definition of "set-changing" to the kind of abstract thinking and reasoning ability essential in a trial, and specifically to the ability to understand complex procedural rights such as the right to silence and the presumption of innocence; the relationship between charges, evidence, and procedures; and what a plea of guilty actually means. 2019 Hillman Report at 8. This court is not in a position to assess whether Dr. Hillman's use of the term is technically correct (Dr. Goldstein suggests it may be idiosyncratic) but regardless, what Dr. Hillman is talking about does seem critically relevant to the issue of Mr. Verdino's competence.

The first competency opinion concluded with this court's finding that because Mr. Verdino's incompetency results from a permanent disability, "he is unlikely ever to improve." *Verdino I*, 2010 WL 1979428, at *7*. "While patient tutoring might increase his

familiarity and comfort with the trial process, there is nothing in the record to suggest that his assessment capacity or set-changing capacity can be improved." *Id.* (footnote omitted).

### C. Restorability Evaluation at FMC-Butner

Shortly after the first competency opinion was issued, the court convened a status hearing to determine how to proceed. *See id.* at *7 n.7 (citing 18 U.S.C. § 4241(d)) (other citation omitted). The governing statute provided that if the defendant is found incompetent, the court "shall commit the defendant to the custody of the Attorney General" who in turn "shall hospitalize the defendant for treatment in a suitable facility [as defined in 18 U.S.C. § 4247(a)]." 18 U.S.C. § 4241(d).

The parties disagreed about whether to commit Mr. Verdino to the Attorney General's custody for a determination of whether he was reasonably likely to be restored to competency. *See* § 4241(d). They also disagreed about where he should be placed and how long the placement should last. The court set a briefing schedule. Min. Entry, ECF No. 74. Mr. Verdino filed an opening brief, ECF No. 75, but the court did not resolve the question because the parties agreed in August 2011 to commit Mr. Verdino to the custody of the Attorney General to be placed in the U.S. Bureau of Prisons medical facility in Butner, North Carolina ("FMC-Butner"), for up to four months for a restorability evaluation. *See* Min. Entry and Agreed Order of Commitment, Aug. 4, 2011, ECF Nos. 83, 84.

FMC-Butner staff initially placed Mr. Verdino in an open housing unit. Butner Report at 5. They also enrolled him in a vocational rehabilitation hygiene program. *Id.* at 6. His vocational rehabilitation counselor reported that he initially made good progress. *See id.* However, his "hygiene and grooming began to decline" within a month of his arrival. *Id.* at 6, 15. He stopped regularly changing his clothes and bedding. *Id.* He began skipping meals,

13

stopped drinking fluids for up to a day, and missed doses of his medication. *See id.* at 6–7. Mr. Verdino also admitted to staff that he urinated on the floor of his room at night when he could not reach a urinal. *Id.* at 6, 15. According to the report prepared by FMC-Butner officials, "When the potential safety hazard and inappropriateness of this practice was discussed with Mr. Verdino he agreed to discontinue, but did not seem to grasp the seriousness of the issue." *Id.* at 6. The behavior nevertheless continued. *Id.* at 15.

Due to his deterioration, FMC-Butner staff moved Mr. Verdino to a locked unit in order to provide him greater structure and close monitoring by medical staff. Butner Report at 7. Mr. Verdino's self-care improved with assistance of the staff on the locked unit. *Id.*

Mr. Verdino also attended one-on-one and group sessions while at FMC-Butner at which staff presented attendees with information about court proceedings and various legal topics. *See* Butner Report at 6. The Butner report describes Mr. Verdino as "attentive" at these sessions, adding that he appeared to put forth his "best effort and asked appropriate questions when confused." *Id.* at 6. The Butner evaluators opined that Mr. Verdino "seemed to have a simple, yet factual understanding of most legal concepts discussed." *Id.*

At the conclusion of his stay, FMC-Butner staff administered several tests to assess Mr. Verdino. *See id.* at 8–12. They measured his full-scale IQ score as 67, putting his "overall intellectual and cognitive ability in the 1st percentile, . . . consistent with an Extremely Low level of intellectual functioning." *Id.* at 8. Consistent with other data, Butner evaluators found Mr. Verdino's "working memory and processing speed" to be in the "extremely low range;" that "[p]erformance in these areas can be affected by attentional deficits, distractibility, and/or anxiety;" and that Mr. Verdino had at times to be redirected to task. Butner Report at 8–9. Anxiety was noted repeatedly. *See, e.g.,* Butner Report at 9, 11. The Butner report states:

14

"Mr. Verdino was cooperative with all testing and appeared to give his best effort. He was easily distracted at times, but easily redirectable." *Id*. at 8.

The writers of the Butner report opined that Mr. Verdino met the criteria for mild mental retardation (now referred to as intellectual disability) and dependent personality disorder.[5] FMC-Butner's director certified that Mr. Verdino met the minimum criteria to be competent to stand trial. *Id.* at 16. The Butner report also listed a series of accommodations Mr. Morris could provide in order to allow Mr. Verdino to assist meaningfully in his defense. *See id.*

### D. Second Competency Hearing and Guilty Plea

If the director of the facility evaluating the defendant certifies that the defendant's competency has been restored, the court must "hold a hearing, . . . to determine the competency of the defendant." 18 U.S.C. § 4241(e). This court held the required second competency hearing on May 3, 2011. *See id.* The government called the authors of the Butner report, Dr. Jaclyn E. Grad[6] and Dr. Jill R. Grant. Mr. Verdino called himself and Dr. Hillman.

For the most part, Drs. Grad and Grant testified consistently with their report. Dr. Grad clarified that if Mr. Verdino disagreed with his lawyer he would express his disagreement but would essentially defer to his attorney, despite his own feelings. 5/3/2011 Tr. at 32. Dr. Hillman, who met with Mr. Verdino twice after his return from Butner, testified that Mr. Verdino had not,

---

[5] The report explained the overlap and distinction between the two diagnoses as follows:

> The important distinction between Mental Retardation and Dependent Personality Disorder is that the former is based in intellectual impairment, whereas the latter is more related to chronic but volitional factors. Mr. Verdino's deficits appear to be a combination of both limited intellectual capacity as well as voluntary overreliance on others; therefore both diagnoses are warranted in this case.

Butner Report at 16.

[6] Dr. Grad testified that she was serving a one-year internship at FMC-Butner when she evaluated Mr. Verdino's competency under Dr. Grant's supervision. 5/3/2011 Tr. at 5. Dr. Grad expected to receive her Ph.D. in clinical psychology in August 2011. *Id*. at 4. From an internet search, it appears that Dr. Grad obtained her Ph.D. and she is presently practicing psychology in Texas. She is referred to as Dr. Grad in this opinion.

in his opinion, been restored to competency, though his factual understanding of the legal system had increased modestly. *Id*. at 71, 75–76.

Mr. Verdino testified he had no idea whether he had been convicted or prosecuted at the time. *Id*. at 92. Asked to summarize the testimony he had just listened to at the second competency hearing, Mr. Verdino understood that the government's witnesses said he was competent, but he could not articulate the content of Dr. Hillman's testimony. *See id*. at 95–96. The assistant United States Attorney began his cross examination by asking Mr. Verdino whether he (the prosecutor) was the prosecutor or the defense attorney. Mr. Verdino responded, "Both?" *Id*. at 100.

The court set a schedule for submitting post-hearing briefing. ECF No. 92. Neither side filed a brief, however. Mr. Verdino's attorney informed the court in August 2011 that an agreement for Mr. Verdino to plead guilty had been reached. *See* ECF Nos. 94, 95.

This court stated on the record at Mr. Verdino's change of plea hearing that it would have ruled that he had not been restored to competency. 8/9/2011 Tr. at 25. The court nevertheless accepted Mr. Verdino's guilty plea at a hearing held August 9, 2011. ECF No. 96. The government and Mr. Verdino's lawyer had reached an informal agreement under which the government recommended a sentence of time served, well below the advisory sentencing guidelines range the government calculated for Mr. Verdino's offense (97–120 months). *See* ECF No. 97 (reciting Mr. Verdino's understanding of the agreement).[7]

---

[7] The government has argued that the fact that the court accepted Mr. Verdino's guilty plea demonstrates that the court found him competent. To the contrary, as the court said at the guilty plea hearing, it would have adhered to its finding of incompetence if the issue were whether Mr. Verdino was competent to stand trial. 8/9/2011 Tr. at 25. A guilty plea, where the court can take the time to explain its questions to Mr. Verdino, raises issues of much less complexity than a trial or a supervised release hearing, and the transcript of the guilty plea hearing makes plain the problems of explaining legal concepts to Mr. Verdino, even with an abundance of time and patience. Was he competent to enter a plea? Marginally, at best. Did he make his own decision or defer to Mr. Morris? The court has no idea. The court was grateful that the government and defense counsel reached what appeared to be a pragmatic agreement when the alternative promised endless proceedings where nothing could be satisfactorily resolved and the

16

### E. Supervision History, Pending Allegations, and Pending Charges

After he pleaded guilty in 2011, Mr. Verdino returned to live with his mother. The court received no reports of problems with his supervision while he lived with his mother.

In or around 2013 or 2014, a daycare center opened near Mr. Verdino's mother's home, forcing him to relocate because he was a registered sex offender. *See* ECF No. 106 at 3. Mr. Verdino then lived with his brother in Des Plaines, Illinois, until his brother sold the trailer in which they were living. *See id.*

Mr. Verdino's mother then was forced to rent a walkup apartment for him in Chicago; the apartment is approximately a 20-minute drive from his mother's home. *See* ECF No. 110 at 9. As discussed above, Mr. Verdino's mother and sister continue to provide him substantial support since he moved into the apartment. They do his grocery shopping and manage his medical care. *See* 2019 Hillman Report at 6.

In 2015, Mr. Verdino's probation officer found a cell phone, still in its packaging, in plain sight on a table in Mr. Verdino's apartment. ECF No. 107 at 2–3. According to the probation officer's report, Mr. Verdino stated that his sister had given it to him, and the probation officer did not request that the court take any action. *Id.* at 3. Notably, a polygraph examination of Mr. Verdino was attempted, but it could "not be administered on Mr. Verdino due to his lack of mental comprehension." *Id.* Further polygraph examinations were ruled out for this reason. *See id.*

On May 14, 2018, Mr. Verdino's probation officer filed a violation report alleging that three cell phones with internet capabilities were found in Mr. Verdino's apartment during an unannounced visit on March 23, 2018. ECF No. 108 at 3. Mr. Verdino also allegedly admitted

---

possibility of further incarceration (and further separation from his family and maybe decompensation) for Mr. Verdino.

to searching the internet for adult pornography and information on how other child pornography cases were sentenced. *Id.* The probation officer asked for and received Mr. Verdino's consent to add a condition of supervised release permitting searches of his apartment; Mr. Verdino signed a form (his competency to do so has not been litigated) authorizing the searches of his apartment that followed. *See id.* at 4, 8.

Mr. Verdino's apartment was searched on separate occasions in July, September, and October 2018. *See* ECF No. 110 at 4–5, 7. Government agents seized several video cassettes, DVDs, and cell phones, some of which allegedly contained child pornography. *See* ECF No. 117 (forensic report describing alleged contents of materials seized).

In October 2018, the probation officer filed a petition asking the court to revoke Mr. Verdino's term of supervised release for, among other things, possessing child pornography. ECF No. 110 at 9. Mr. Verdino has been separately charged by criminal complaint in No. 18-cr-895 with possessing child pornography. All charges stem from the 2018 searches of his apartment. *See* Compl., No. 18-cr-895, ECF No. 1 (N.D. Ill. Dec. 28, 2018).

Mr. Verdino faces a combined mandatory minimum prison term of 15 years, broken down as follows. Because Mr. Verdino has a prior conviction for possession of child pornography, he must be sentenced to a mandatory minimum of 10 years imprisonment with a 20-year maximum if he is found guilty in No. 18-cr-895. 18 U.S.C. § 2252A(b)(2). In addition, as the petition for revocation in this case states, under 18 U.S.C. § 3583(k), a supervised release violation for possession of child pornography carries a five-year mandatory minimum sentence upon revocation. ECF No. 110 at 6. The Supreme Court held § 3583(k) unconstitutional in *United States v. Haymond*, 139 S. Ct. 2369 (2019), but left open the question of the proper remedy for

the statute's unconstitutionality. *United States v. Hollman*, 774 F. App'x. 303, 303–04 (7th Cir. 2019).

At the instance of Mr. Morris and the clinician providing Mr. Verdino's sex offender treatment, this court found in December 2018 that there was reasonable cause under 18 U.S.C. § 4241(a) to question Mr. Verdino's competency.  ECF No. 125, Dec. 7, 2018; *see also* Letter dated Nov. 30, 2018, ECF No. 124 (attachment to special report).  Indeed, the sex offender treatment specialist who had been seeing Mr. Verdino since January of 2017 wrote that she "suspect[ed] his cognitive functioning may be declining" and requested a "full psychological and neurological evaluation."  Letter dated Nov. 30, 2018, at 3, ECF No. 124 attachment.

The related charges in No. 18-cr-895 have been stayed pending resolution of the competency question in these supervised release revocation proceedings.  *See, e.g.*, Min. Entries, No. 18-cr-895, ECF Nos. 16, 33, 51.  The parties have agreed that this court's competency decision will control the competency issue in No. 18-cr-895.  3/3/2021 Tr. at 4; Def. Resp. to Competency Br. at 6 n.2, ECF No. 178.

The competency evaluations took the better part of a year to complete.  The government's expert, Dr. Diane S. Goldstein, evaluated Mr. Verdino and submitted an 89-page report opining that Mr. Verdino is competent.  Gov't Ex. 2, ECF No. 167; *see* Goldstein Curriculum Vitae, Gov't Ex. 1, ECF No. 167.  Dr. Hillman interviewed Mr. Verdino on several occasions and submitted a report in which he explains the basis of his opinion that Mr. Verdino remains incompetent.  Def. Ex. 4, ECF No. 172.  While his competency was being evaluated, Mr. Verdino was released and placed on home detention with electronic monitoring subject to a number of highly restrictive conditions limiting such things as his ability to subscribe to cable television and possess electronic equipment and media.  *See* Release Orders, ECF Nos. 115, 122, 150, 151, 156.

Over the two years during which Mr. Verdino's competency was being evaluated, a number of status hearings were held regarding various alleged violations, none of which resulted in negative consequences for Mr. Verdino. At these status hearings, Mr. Verdino invariably remained passive as his mother and attorney addressed the substance of the issues. Recently, on May 4, 2021, the government and the probation officer agreed to modify Mr. Verdino's conditions of release, allowing him to take a weekly walk in his neighborhood, either alone or accompanied by an adult family member, subject to certain limitations. *See* ECF No. 181 ¶¶ 2, 4.

### III. The Present Competency Proceedings

At the competency hearing held March 3, 2021, the court received into evidence Dr. Hillman's and Dr. Goldstein's resumes, their written competency evaluations, and several competency reports written by Dr. Hillman earlier in this case. *See* Ex. List, ECF No. 168. Drs. Hillman and Goldstein testified.

The hearing had to be held by video and teleconferencing because of the COVID-19 pandemic. Mr. Verdino's conditions of release did not allow him to use a video-capable computer or other device to participate in the hearing using the court-authorized videoconferencing platform. Consequently, Mr. Verdino listened to the hearing by telephone. He could not see the lawyers or witnesses. Nor could he confer with his lawyer without interrupting the proceedings. Mr. Verdino never asked to speak to his lawyer.[8] The following summaries of the experts' opinions draw upon their reports and testimony as well as agreed facts reflected in the post-trial briefing.

---

[8] With all parties and the experts assembled, the limits of the court's technology, given Mr. Verdino's court-mandated lack of internet access, became clear for the first time. The court's efforts to get technological help to solve the problem proved unavailing. In order to allow the hearing to go forward, Mr. Morris consented to proceeding in this manner. Mr. Verdino, albeit somewhat ambiguously, appeared to join in Mr. Morris's consent. *See* 3/3/21 Tr. at 3–4.

### A. Dr. Goldstein's Opinions

Dr. Goldstein is an expert in neuropsychology and clinical psychology. 3/3/2021 Tr. at 7; *see* Gov't Ex. 1, ECF No. 167 (resume). She bases her opinions on a battery of neurocognitive tests administered by her technician, her competency interview of Mr. Verdino, and her review of prior reports and papers filed in this case. *See* Goldstein Report at 3, Sept. 13, 2020, Gov't Ex. 2, ECF No. 167; 3/3/2021 Tr. at 22–24. Dr. Goldstein performed a "full neurocognitive evaluation" of Mr. Verdino. *See* 3/3/2021 Tr. at 9, 16–17, 21. A full neurocognitive examination includes tests of the examinee's effort and is intended to verify the validity of the IQ test and other (unspecified) cognitive test results. Such an examination is not always a necessary element of a competency evaluation. Gov't Reply Br. at 1, ECF No. 177. A clinical psychologist such as Dr. Hillman, the defense expert, is qualified to administer IQ and other (unspecified) cognitive tests but not a comprehensive neurocognitive evaluation. 3/3/2021 Tr. at 8–9.

### 1. Goldstein: IQ

Dr. Goldstein measured Mr. Verdino's full-scale IQ at 67. *See* Goldstein Report at 8–9. An IQ of 67 falls below the 70 cutoff that has been generally thought to mark the line for intellectual disability. *See id.* at 8. Dr. Goldstein explained that the experts who evaluated Mr. Verdino in 2009–11 used the DSM-4's criteria for diagnosing intellectual disability, and using those criteria, Dr. Goldstein would have agreed. 3/3/2021 Tr. at 51–52. However, in 2013, after the last round of competency proceedings in this case, the DSM-5 was published. The DSM-5 requires a direct relationship between gaps in intellectual functioning and gaps in adaptive functioning in order to diagnose an intellectual disability based on both. *See* Goldstein Report at 5 & app. 5; *see also Webster v. Watson*, 975 F.3d 667, 685–86 (7th Cir. 2020). In Mr. Verdino's case, there are gaps in adaptive functioning likely attributable to his physical

disabilities (such as cerebral palsy) and the way he was raised (little formal schooling; a family that, in Dr. Goldstein's view, failed adequately to push him to develop abilities to live independently) that are not directly related to his level of cognitive functioning. For this reason, applying the DSM-5 criteria, Mr. Verdino's full-scale IQ likely underestimates his cognitive capacity because his physical disabilities, as well as his weakness in working memory, render some IQ tests "unreliable" and result in findings that cannot be interpreted. Goldstein Report at 45, 54; *accord* 3/3/2021 Tr. at 39 (Dr. Goldstein: "You really can't interpret the impaired findings.") A subset of IQ tests called the General Ability Index ("GAI") excludes the unreliable subtests. Mr. Verdino's GAI score is 73. Goldstein Report at 54.

While Dr. Goldstein made clear that Mr. Verdino's measured IQ of 67 may underestimate his cognitive capacity, her opinion does not guide the court in assessing how the unreliable aspects of the IQ tests (such as weakness in working memory) should be interpreted in terms of competency to stand trial. The court, of course, is not concerned with IQ considered in isolation from other relevant disabilities, but all of Mr. Verdino's current abilities and disabilities which bear on the *Dusky* standard. For instance, if somehow Mr. Verdino's lack of formal schooling, defects in working memory, or his family's failure to push him to live independently left him excessively dependent on others (such as his lawyer) or unable to follow trial testimony, the court cannot defer to the DSM-5 for the idea that these issues should not be counted. The issue is Mr. Verdino's condition now, not what his condition could have been had his life been different from childhood. *See, e.g., McManus v. Neal*, 779 F.3d 634, 658 (7th Cir. 2015); *United States v. Woodard*, 744 F.3d 488, 494 (7th Cir. 2014).

### 2.  Goldstein: Gaps in Adaptive Functioning

Mr. Verdino has not demonstrated an ability to shop for groceries and has never held a job.  Dr. Goldstein concedes that these limitations exist, but attributes them not to IQ but to Mr. Verdino's lack of formal education, motor impairments resulting from cerebral palsy, his family's lack of insight into and support for his limitations, and his dependent personality traits. *See* Goldstein Report at 10–12, 43–44, 51–61.  Mr. Verdino is able to perform some tasks: some shopping, light cleaning, taking the bus (on familiar routes), showering, basic hygiene tasks, routine diabetes testing, caring for his cat, and making light meals (such as sandwiches and microwaveable meals).  3/3/2021 Tr. at 53–54, 79–80.  He knows how to call 911 in case of emergency.  *Id.* at 80.  Dr. Goldstein considers it important that there was some improvement in his adaptive functioning during his stay at the MCC in 2008–09, during his time at FMC-Butner in 2010–11, and after he moved into his own apartment.  3/3/2021 Tr. at 81.  Dr. Goldstein does not address what it meant for Mr. Verdino's adaptive functioning that he appeared suicidal at the MCC, suffered a significant deterioration in his "self-care" at FMC-Butner until he was placed in a highly-supervised locked programming unit, and was cited for no violations of supervised release while he lived with his mother.  *See, e.g.*, Butner Report at 6–7, 15; Report dated July 8, 2014, ECF No. 106 at 2–3; Report dated Nov. 28, 2015, ECF No. 107; Report dated May 14, 2018, ECF No. 108; Report dated Oct. 23. 2018, ECF No. 110.

### 3.  Goldstein: Other Findings

Mr. Verdino "has never met the diagnostic criteria for any Mood, Anxiety, Psychotic, or Substance Disorder."  Goldstein Report at 59.  He has a history of "Adjustment Disorder with Mixed Anxiety and Depressed Mood."  *Id.*  Clinicians could disagree about these diagnoses, and

Dr. Goldstein joins Dr. Hillman in "sort of saying this is a kind of low, mild-level depression/anxiety." 3/3/2021 Tr. at 55.

Mr. Verdino's working memory, sustained attention, and information processing speed are particularly weak. Goldstein Report at 45–46; 3/3/2021 Tr. at 139–40; *see also* Butner Report at 9–12. Anxiety makes it harder for Mr. Verdino to process information and make decisions. Goldstein Report at 65; 3/3/2021 Tr. at 78. He "would have some difficulty assessing errors" in witnesses' testimony and "might . . . or might not" catch such errors. 3/3/2021 Tr. at 76. His attention deficits contributed to difficulty remaining on task during Dr. Goldstein's assessments. *Id.*

Dr. Goldstein also opined on Mr. Verdino's "effort," although the court found her opinions somewhat inconsistent. All prior examiners, including those at Butner, found Mr. Verdino's effort consistently good.[9] Dr. Goldstein, in agreement with these prior examiners, opined on the one hand that Mr. Verdino "performed very well on a number of effort measures, and the problematic performances he did produce may have been influenced in part by working memory deficits," "an area of relative weakness in his overall cognitive profile." Goldstein Report at 45. He had no difficulty, she said, "attending to or understanding the examiner or test instructions over the many hours of a three-day [sic] examination that spanned over 11 weeks." Goldstein Report at 62. The conversation between Dr. Goldstein or her technician and Mr. Verdino "built naturally upon itself," 3/3/2021 Tr. at 48, although Mr. Verdino "speaks very tersely" in "one or two words." 3/3/2021 Tr. at 69. Dr. Goldstein frequently had to prompt Mr. Verdino during the interviews. 3/3/2021 Tr. at 75–76; *see, e.g.,* Goldstein Report at 39–40.

---

[9] FMC-Butner staff found that "Mr. Verdino was cooperative with all testing and appeared to give it his best effort. He was easily distracted at times, but easily redirectable." Butner Report at 8. The Butner evaluators, consistent with most prior evaluators, attributed difficulties testing Mr. Verdino to attention deficit problems and clinically significant anxiety. *See id.* at 9-12.

At the competency hearing, Dr. Goldstein repeatedly disclaimed an opinion that Mr. Verdino was malingering, saying instead that he often was "messing around" when exhibiting a lack of attention and focus, major problems for him.  3/3/2021 Tr. at 38–39, 40–41, 76.

On the other hand, Dr. Goldstein accused Mr. Verdino of intentionally sabotaging certain tests.  3/3/2021 Tr. at 38–39; Goldstein Report at 31–35.  She stated, "Mr. Verdino has . . . been successful in numerous interactions with probation and his treater, as well as during prior competency examinations in my opinion, by providing 'I don't know' responses or otherwise claiming ignorance.  His avoidant approach has unfortunately been reinforced by success and likely encouraged by his family."  Goldstein Report at 65.  Precisely to which tests Dr. Goldstein was referring was not made clear.

### 4.  Goldstein: Set-Changing Capacity

Dr. Goldstein defines set-changing or set-shifting ability "as a type of executive functioning that reflects one's capacity to divide attention between two competing stimuli and to persevere in doing so without 'losing set' or demonstrating 'cognitive inflexibility' by perseverating on one type of information, or on one's approach to problem-solving, despite feedback the approach is incorrect."  Goldstein Report at 55.  Dr. Goldstein administered two tests to assess Mr. Verdino's set-changing capacity, both of which measure visual, rather than verbal, set-changing ability: the "trail-making" test (also used by Dr. Hillman) and the Wisconsin Card Sorting Test ("WCST").  3/3/2021 Tr. at 43–44; Goldstein Report at 48–49.  It was not made clear how visual set-changing capacity relates to Mr. Verdino's ability to follow testimony and argument at trial, or if it is related, how the relationship should be measured or assessed.  In any event, Dr. Goldstein reported that Mr. Verdino "lost set repeatedly" on the trail-making test, achieving a "severely impaired result."  Goldstein Report at 48; *see also* 3/3/2021 Tr. at 43.

Mr. Verdino's result fell into the "moderately impaired" range on the WCST, and Dr. Goldstein noted "no significant signs" of set loss on this test. Goldstein Report at 49; *see* 3/3/2021 Tr. at 44–46. Because set-changing is measured by the WCST, in which Mr. Verdino showed "that he switches sets just fine," Dr. Goldstein does not "put a lot of stock in the trail-making test." 3/3/2021 Tr. at 45–46. It was not made clear in either Dr. Goldstein's report or her testimony whether it is appropriate to ignore Mr. Verdino's "severely impaired result" on the trail-making test. Is it scientifically legitimate to ignore one test in favor of another which produced a better result? The court is not in a position to assess what it means, if it means anything, when an expert disregards a test with a bad result in favor of a test with a better result.

### 5.  Goldstein: Tests Relevant to Ability to Follow Verbal Information

The ability to follow and assess complex verbal information seems highly relevant to Mr. Verdino's competency to stand trial. Dr. Goldstein testified, however, that no single test used by psychologists/neuropsychologists correlates 100% with a person's ability to follow complex, fast-changing verbal information such as testimony or legal argument during a hearing or trial. *See* 3/3/2021 Tr. at 136–37. Nor did Dr. Goldstein identify the extent to which available tests correlate with this ability at all. *See id.* at 137–140. She considers the following abilities to be relevant: (1) verbal abstraction capacity; (2) nonverbal problem solving; (3) working memory; and (4) sustained attention. *See* 3/3/2021 Tr. at 136–37, 139.

Mr. Verdino scored in the low-average range on verbal and nonverbal abstraction tests. 3/3/2021 Tr. at 139; Goldstein Report at 46. Verbal abstraction ability is tested by asking the subject what category two things belong to, such as the ability to recognize that an apple and an orange are both fruit, and a statue and a poem are both art. 3/3/2021 Tr. at 137–39. It was not

made clear to the court how recognizing that apples and oranges are fruit correlates with the ability to follow complex trial testimony.

### 6.  Goldstein: Mr. Verdino's Understanding of Pending Charges

The court found the most useful portion of Dr. Goldstein's report to be her lengthy quoted description of her conversation with Mr. Verdino about the charges he is facing.  One important caveat is that at the time of writing her report, Dr. Goldstein did not appear to appreciate that Mr. Verdino faces two separate charges (supervised release violations, as well as a new criminal case) carrying separate penalties and involving different procedural rights (for example, she did not appear to understand that he may not have a jury trial right on the supervised release violations).  3/3/2021 Tr. at 73–75.  When Dr. Goldstein questioned Mr. Verdino as if he were facing simply a new criminal charge with jury trial rights and applicable mandatory minimums in sentencing, Mr. Verdino did not correct her, suggesting the likelihood that he may not understand (or remember) the two cases he faces.  *See* Goldstein Report at 40, 42.  While recognizing that the pendency of two prosecutions with separate penalties and separate rights makes Mr. Verdino's circumstances more complicated than were he facing just one charge, she opined that he is nevertheless "competent to appreciate his rights within these charges."  3/3/2021 Tr. at 75; *see* Goldstein Report at 40–42.

Dr. Goldstein talked to Mr. Verdino at length about the charges he faces.  The quoted material is extremely useful, as it provides a clear window into what Mr. Verdino understands and fails to understand, and his level of understanding.  For this reason, the material is quoted at length in Appendix 1.

### 7. Goldstein: Ultimate Opinion on Competency

Dr. Goldstein concluded that "Mr. Verdino is competent to stand trial or otherwise proceed." Goldstein Report at 67. Her opinion is accompanied by the conditions under which she believes Mr. Verdino can best function as the law requires: "By now, Mr. Morris is aware that speaking slowly, explaining things in plain language and asking Mr. Verdino to demonstrate his understanding by using his own words—and pushing him when he says he doesn't know something or otherwise provides inaccurate information, and asking for breaks during proceedings to confer with his client, is critical." *Id.*

Dr. Goldstein has no opinion on whether Mr. Verdino is competent to decide whether to assert a competency defense. 3/3/2021 Tr. at 75.

### B. Dr. Hillman's Opinions

Dr. Hillman specializes in forensic psychology. 3/3/2021 Tr. at 91–92, 121; Hillman Resume, Def's Ex. 1, ECF No. 169. He has conducted three examinations of Mr. Verdino in connection with this case (December 2008, April 2009, August 2019), and has been consistent in his opinion that Mr. Verdino is not competent to stand trial. He bases his current opinion that Mr. Verdino is not competent on his prior evaluations in this case; his observations of Mr. Verdino at a hearing held April 24, 2019; and several interviews over time. The most recent interview took place in Mr. Verdino's apartment about a week before the instant (March 2021) competency hearing. 3/3/2021 Tr. at 100. He has spent more than 20 hours interviewing Mr. Verdino and observing him in his mother's home, at his apartment, and while conversing with his lawyer. *See* 3/3/2021 Tr. at 94, 99–100.

There is no psychological test that captures a person's ability to follow complex information at a trial or hearing. 3/3/2021 Tr. at 135–36. Although IQ is relevant, a person's functional capacity matters more for competency purposes than IQ. 3/3/2021 Tr. at 96, 98, 112. IQ test results for Mr. Verdino have been consistent since 1970. 2019 Hillman Report at 4. No medical diagnosis in the DSM-4 or DSM-5 corresponds to fitness to stand trial. 3/3/2021 Tr. at 122. However, Mr. Verdino satisfies the DSM-4 criteria for a diagnosis of mild intellectual disability. 2019 Hillman Report at 4. In trying to assess Mr. Verdino's ability to follow complex information, because there are no tests on which to depend, the examiner must rely on interviews and observations. 3/3/2021 Tr. at 135–36.

In terms of functional capacity, Mr. Verdino performs basic cleaning and cooks light meals for himself. *See* 3/3/2021 Tr. at 100–01. He does not manage his own medical care independently, must be driven to medical appointments (where his mother speaks for him), does not manage his own money, lacks the writing skills needed to write checks, does not measure food for his cat in individual portions but rather dumps the entire bag of food into a tray for the cat to eat, and requires the assistance of his mother or sister to shop for groceries. *See* 2019 Hillman Report at 2–3, 5; 3/3/2021 Tr. at 100–02.

Mr. Verdino is more impaired in verbal reasoning skills than mechanical or performance skills (all of his verbal IQ test scores are below 70). *See* 2019 Hillman Report at 4; 3/3/2021 Tr. at 96. Impairment in verbal skills reflects limitations in abstract thinking associated with capacity for set changing, defined by Dr. Hillman as maintaining in one's mind hypothetical alternatives, 5/3/2011 Tr. at 77, and is highly relevant to his ability to assist his lawyer with his defense. *See* 2019 Hillman Report at 4; 3/3/2021 Tr. at 96; *Verdino I,* 2010 WL 1979428, at *4. Consistent with his low verbal IQ, Mr. Verdino functions at a 3rd grade level on sentence

comprehension. He is substantially limited in his ability to integrate complex verbal information in order to make informed decisions in the context of a trial. 2019 Hillman Report at 10.

Dr. Hillman's testing of Mr. Verdino in 2008 revealed significant impairments in memory and problem solving. 3/3/2021 Tr. at 114; 2008 Hillman Report at 7. Stress and anxiety further impair Mr. Verdino's abstract-thinking and decision-making abilities. *See* 3/3/2021 Tr. at 114; 2008 Hillman Report at 7.

Due to his involvement in this case, the many competency examinations he has undergone, and his incarceration at FMC-Butner for competency "restoration," Mr. Verdino has greater knowledge of the facts surrounding his prosecution than he did in 2008-11. *See* 2019 Hillman Report at 7-8. "He is aware that he is the defendant and he is aware that he is currently charged with violations of court supervision and new charges of Possession of Child Pornography." *Id.* at 7. He can identify the "three primary officers of the court and their roles," and he understands that evidence is needed to substantiate a criminal charge. *Id.* at 7–8; 3/3/2021 Tr. at 129. But nothing material to his competency has changed, and he remains incompetent. 3/3/2021 Tr. at 132.

He "does not understand that the judge is the gatekeeper for evidence or why the judge would be concerned about a defendant's competency to stand trial." 2019 Hillman Report at 8; *see* 3/3/2021 Tr. at 105. He does not understand the separate criminal complaint and supervised release violations pending against him or their implications for the decisions he would have to make if he were found competent. *See* 3/3/2021 Tr. at 105. He does not understand the presumption of innocence or his Fifth Amendment right to remain silent. 2019 Hillman Report at 8. He understands a guilty plea as meaning a less lengthy sentence, and he does not appreciate that pleading guilty would require him to give up his right to a trial. *Id.* When asked about a

plea agreement, he reacts emotionally rather than based on reflection about the issues involved. 3/3/2021 Tr. at 108.  His overriding concern is to avoid prison, but he does not have a sufficient understanding to consider his options.  2019 Hillman Report at 9.

Dr. Hillman never observed behavior he believed was malingering.  2019 Hillman Report at 7; 3/3/2021 Tr. at 99.  When Mr. Verdino feels insecure about being made to look stupid, as in formal testing, he sometimes compensates by engaging in playful or distracted behaviors. 3/3/2021 Tr. at 99.  His needs for approval and to avoid conflict lead him to feign understanding when he has none.  2019 Hillman Report at 9.  He looks to others for guidance when he does not understand, rather than making decisions of his own.  *See id.* at 9–10.

The accommodations suggested by other experts (taking breaks during the trial to explain what is happening) would not help because Mr. Verdino lacks the basic ability to understand the abstract concepts being explained.  3/3/2021 Tr. at 108–09.

Nothing material to Mr. Verdino's competency has changed since 2011.  3/3/2021 Tr. at 133.  He remains incompetent, in Dr. Hillman's opinion.  *Id*. at 132.

## IV.  Analysis

The government, in its Brief as to Competency, ECF No. 176, does not argue that Mr. Verdino can proceed to trial without accommodations.  Indeed, its experts, including most recently Dr. Diana Goldstein, have recommended that for Mr. Verdino to follow the proceedings with comprehension, "court proceedings [must be segmented] into 'brief pieces,' providing enough time for counsel to check in on the defendant's understanding and 'translate' any legal or procedural 'lingo' that arises along the way."  Gov't Comp. Br. at 14.

Dr. Goldstein's opinion on the usefulness of such accommodations is consistent with that of the other government experts.  Dr. Nieberding believed that Mr. Verdino's ability to "navigate

the process of criminal adjudication would be enhanced" by three accommodations: encouragement to ask questions [of whom or when was not specified], avoiding verbal information "that is overly complex or abstract in nature" [not specified if this is envisioned as a limitation on witnesses or on counsel], and asking him "to summarize information he has been presented with in order to ensure accurate understanding." Nieberding Report at 11, Mar. 7, 2009. At the April 2, 2010 competency hearing, Dr. Nieberding testified, "I believe that he probably could maneuver through this process but he's going to need some assistance, some accommodations." 4/2/2010 Tr. at 18. Dr. Nieberding agreed that Mr. Verdino could become emotionally overwhelmed during a trial, rendering him unable to assist with his defense. 4/2/2010 Tr. at 22.

>	Dr. Dinwiddie similarly opined:

>	Specific defects in his knowledge (such as those noted above) should be addressed by his attorney when identified; if the information is presented in a simple and clear fashion he should have no difficulty retaining it (although it may require several repetitions). All parties to the trial should keep in mind that [Mr. Verdino] has substantial intellectual deficits and may misinterpret or misunderstand statements by others. Thus, it may be helpful to have him summarize his understanding of the situation at appropriate points during the trial and correct any misapprehensions should they occur.

>	Dinwiddie Report at 10, Dec. 10, 2009.

>	Dr. Dinwiddie testified that Mr. Verdino "is probably going to need more than the average education and ongoing testing to make sure . . . that he really understands things; that he's going to need some more-than-the-average reassurance that it's okay to disagree, that it's okay to question." 4/2/2010 Tr. at 54. Dr. Dinwiddie further testified that "certainly you would be concerned that he might need some refreshing or education on specific legal concepts," so that he could grasp things "that may arise unpredictably during the trial." *Id.* at 54–55.

Dr. Grad and Dr. Grant, who evaluated Mr. Verdino at FMC-Butner, opined that

Mr. Verdino was competent, but, noting that he was at "an extremely low range of functioning"

on working memory and processing, 5/3/2011 Tr. at 28, recommended "helpful"

accommodations:

> [D]espite meeting the minimum standards of competency, Mr. Verdino does have
> some cognitive and emotional limitations.   Given his limitations, certain
> accommodations could be made to further accommodate Mr. Verdino's
> participation.  For example, Mr. Verdino has a very concrete awareness of the legal
> system.  In order to ensure that he is adequately prepared for court proceedings,
> information should be presented to him using multiple repetitions to help him better
> retain information.  He should then be asked to repeat the information in his own
> words to ensure that he understands pertinent details.  Information should also be
> presented to Mr. Verdino using multiple formats when possible.  He has some
> deficits in verbal comprehension, so it would be best if he is given information that
> is visually presented.  Mr. Verdino may also have difficulty sustaining his attention
> for a lengthy period of time.  However, if he is given frequent breaks and if his
> attorney works with him ahead of time to ensure he knows what to expect, he should
> have no problems in this area.

Butner Report at 16.  Significantly, the Butner report does not indicate how Mr. Verdino

can be expected to understand aspects of the trial, such as witness testimony, that are

unpredictable in advance, nor whether, with his undisputed defects in working memory, he will

remember the "pertinent details" that his attorney has multiply repeated to him and which he has

then repeated in his own words in advance of trial, as these things come up in their predictably

complex formulations during the trial.  *See id.*

Dr. Goldstein echoed many of these recommended accommodations in her report and at

the March 3, 2021, competency hearing.  In addition, her report and testimony recommend

accommodations during trial, not just at some point prior to trial.  Her report states, "By now

Mr. Morris is aware that speaking slowly, explaining things in plain language and asking

Mr. Verdino to demonstrate his understanding by using his own words—and pushing him when

he says he doesn't know something or provides inaccurate information, and asking for breaks during proceedings to confer with his client, is critical." Goldstein Report at 67.

Many courts have expressed serious doubts that such accommodations can be realistically implemented at a hearing or trial. In *United States v. Silva*, 2013 WL 6576788, at *9 (D. Utah July 31, 2013), for instance, the government experts suggested that the defendant would benefit from repetition and "simple instructions and explanations from his attorney." Judge Nuffer called this an "astonishing" alteration in proceedings when considering what it could mean in practical terms. *Id*. He pointed out that "[i]t is well recognized in trial courts that repetition of evidence by witnesses is prohibited and often leads to prejudice to the opposing party." *Id*. To proceed to trial under such conditions gives the defendant a choice between a factual and rational understanding of the proceedings and the unfairness of allowing the government's witnesses to repeat their testimony multiple times. *Id*. Moreover, the defendant's deficits and infirmities would make it impossible for him to make "myriad smaller decisions concerning the course of his defense." *Id*. at *10.

In *United States v. Kimble*, 2012 WL 2049885 (W.D. La. May 22, 2012), a government expert suggested, *inter alia*, that court hearings be limited to shorter than normal duration, that all communications between the court and the defendant "be pursued in the simplest language possible," and that the defendant be required to "repeat back, in his own words, those provisions of the communications that are central to the topic at hand." *Id.* at *3. Judge Hornsby ruled that these accommodations, particularly the last two (similar to those proposed here), were unrealistic, given the complexity of the case before him. He stated, "It is unreasonable to attempt to require that witnesses, counsel and the court use overly simplistic language during the trial. It is also unreasonable and impractical to stop the trial frequently so that Defendant can

34

repeat trial testimony back to his counsel in his own words to ensure that Defendant has a clear understanding of the proceeding." *Id.*

In *United States v. Calek*, 48 F. Supp. 2d 919 (D. Neb. 1999), Judge Bataillon similarly found such proposed accommodations unrealistic and inadequate:

> [T]he FMC report suggested that some negative symptoms of the defendant's schizophrenia that could affect his ability to participate in his defense—stress and fatigue—could be alleviated "by giving him frequent breaks." The report further suggests that defense counsel could "assist the defendant by explaining things simply and concretely and checking to make sure he understands by asking him to repeat back the information." To get around other symptoms of the defendant's schizophrenia identified by Dr. Logan as "low morale, poor motivation, a lack of interest in his surroundings, social withdrawal, isolation, easy fatigability and low energy," the report suggests the defendant could be made to overcome his "begrudging" compliance in performing tasks by "strong encouragement."
>
> As practical as this advice may seem, . . . such suggestions are hardly workable during a jury trial for bank robbery. The disruption and delay caused by frequent rest or "explanation and repeat back" breaks would be considerable. Moreover, a jury could not help but be prejudiced by an attorney "strongly encouraging" his stressed, fatigued, withdrawn, and bewildered client to comply with some request he could not understand and process. Finally, a defendant who is battling to control auditory hallucinations would be hard-pressed to listen critically to his attorney's advice, the testimony of a witness against him, or directions from the court.

*United States v. Calek*, 48 F. Supp. 2d 919, 923 (D. Neb. 1999) (record citations omitted); *but see, e.g.*, *United States v. Glover*, 596 F.2d 857, 867 (9th Cir. 1979) ("The fact that a defendant might not understand the proceedings unless they are explained to him in simple language would put an additional burden upon counsel, but certainly does not establish that the defendant is incompetent to stand trial"); *United States v. Speelman,* 2016 WL 3129180, at *8 (E.D.N.C. June 2, 2016) ("To be sure, this case is not without its challenges due to Defendant's limited cognitive abilities. However, as explained by Dr. Brauman, these difficulties may be alleviated through patient explanation of information and material to Defendant as this case proceeds.").

The court rejects out of hand one aspect of the proposed accommodations. The role that the experts envision for defense counsel, simultaneously managing the demands of a trial (making and justifying objections, making legal argument based on the constantly changing circumstances in the courtroom, listening to testimony, preparing to cross-examine government witnesses and adapting as needed to their unexpected testimony and/or responses) while monitoring Mr. Verdino's understanding to know when to request a break, when to explain things to Mr. Verdino, and when to require him to repeat things in his own words, is completely unworkable. Anyone who has ever attempted to defend a criminal case is well aware that for most humans, full attention and enormous cognitive flexibility is required at all times. The court is not inclined to adopt an accommodation as inconsistent with zealous, competent representation as this one (lawyer acting as lawyer augmented by requirements to act as teacher/social worker/psychiatrist) is. Any accommodation that the court is willing to consider must, at the very least, address in a realistic way what, if any, assistance Mr. Morris would need to perform the multiple roles the government's experts require of him during any substantive hearing or trial.

Having reviewed the above authorities, the court is skeptical that the accommodations proposed can render Mr. Verdino competent, or that they can be practically implemented during a fast-moving trial or supervised release violation hearing. Nevertheless, the government, as well as its experts, put their stock in accommodations, and the court is unwilling to discount them without a concrete understanding of what the government proposes and how any such proposal could be implemented. As the party with the burden of proof, the government must be given an opportunity to demonstrate how its proposed accommodations can be practically implemented at a hearing and/or trial.

36

In considering any proposed accommodation, it must also be borne in mind that the court has an independent obligation to monitor Mr. Verdino's competency during a hearing or at trial. *See Pruitt v. Mote*, 503 F.3d 647, 657–58 (7th Cir. 2007) (citing *Drope v. Missouri*, 420 U.S. 162, 171–72 (1975)); *Timberlake v. Davis*, 409 F.3d 819, 822 (7th Cir. 2005) ("the due process clause requires the trial judge to inquire *sua sponte* into a defendant's mental state, if events in court imply that the accused may be unable to appreciate the nature of the charges or assist his counsel in presenting a defense"). How the court will be able to monitor whether the explanations Mr. Verdino is receiving are sufficient without piercing the attorney-client relationship has not been explained. Another lurking issue is whether the proposed accommodations would put Mr. Verdino's counsel in a conflict of interest position if Mr. Verdino were convicted and had an argument that the trial accommodations were inadequate.

Before the court decides the issue of competency, the government will be given an opportunity to demonstrate that its proposed accommodations can be practically implemented at a hearing or trial. The government is given 21 days (until October 11, 2021) in which to provide a detailed proposal explaining its proposed accommodations and explaining how each could practically be implemented at a bench or jury trial or substantive evidentiary hearing. The defense, if it wishes to respond, has 14 days (until October 25, 2021) in which to do so.

Dated: September 20, 2021

                                                    /s/
                                       Joan B. Gottschall
                                       United States District Judge

# APPENDIX 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| United States of America | ) | |
| | ) | Case No.: 08-cr-0653 |
| v. | ) | |
| | ) | Honorable Joan B. Gottschall |
| Larry Verdino | ) | |

## <u>APPENDIX 1</u>

The following is an excerpt from the "Competency Evaluation" section of

Dr. Diana Goldstein's Report dated September 13, 2020 (Gov't Ex. 2, ECF No. 167):

When asked his understanding of the charges he is potentially facing, Mr. Verdino responded, "They claim they found some new stuff. But it's old stuff that they didn't recover from the last time—bad stuff." He clarified "They" was a reference to his probation officer, "Carrie Holberg…and the police." Mr. Verdino was asked to explain what "bad stuff" he was referring to, to which he responded, "Adult pornography." With prompting he added, "It was a video of two guys on a bed doing something. They said it was bad, I shouldn't have it." The examiner again prompted Mr. Verdino ("<u>Q</u>. Are you saying you are facing charges of having adult pornography?"). "Teenage pornography," he responded. He was asked the reason this was illegal. "Anybody under 17 is illegal," he explained. When the examiner asked how many tapes were found at his home, Mr. Verdino said, "As far as I know, two of 'em."

When asked the reason police were requested to search his home to begin with, Mr. Verdino's response and the conversation that followed was indirect/off-topic (the inquiry was repeated later). He explained, "My probation officer is nosy. She wanted to know what was on my CDs, so she had the cops come over—that was Halloween, 2018." Mr. Verdino became animated at this point and said, "They broke the door down!" When asked why, he responded, "They were banging on the door, I was sleeping." When asked the reason he did not answer the door, he said, "I knew it was them. I thought they'd think I wasn't there and go away." He spontaneously added, "People throw M-80s and firecrackers at my house, a guy stands outside my house and there's shooting in the neighborhood—I call the cops a lot, there's lots of shootings over there…near Belmont and Central." Mr. Verdino was asked if he was suggesting shootings and firecrackers being thrown were aimed at him specifically, to which he responded, "No, it's a violent neighborhood." The question regarding not opening his door to police was reposed. He stated, "I didn't know it was the cops." He was asked if he meant the officers did not identify themselves, or that he simply could not hear them. He responded, "But then I could hear them talking to neighbors and I saw a police car outside." He ultimately confirmed he *did* know the police were there to speak to him and nonetheless did not present himself, contradicting his initial statement.

Mr. Verdino went on, "Then they went to my mother's house and she called me to say, 'Are you okay? The FBI was at my house.' Then they came back and said, 'You better open this door,

or we'll break it down!' She said her name was Shannon McDaniels. So, I did open the door." With prompting, Mr. Verdino clarified this occurred the same day, after law enforcement spoke to his mother. The examiner then asked, "Q. So, they didn't break down the door?" to which Mr. Verdino responded, "No, I exaggerated." When asked the reason he would say such a thing knowing it not to be true, Mr. Verdino shrugged his shoulders and said, "My probation officer is just mean. I didn't do nothing wrong." The examiner confronted Mr. Verdino: "Q. But you had some things in your home you weren't supposed to have, is that right?" Mr. Verdino nodded affirmatively and said, "But that was from before." The examiner clarified, "Q. So you feel it isn't fair, is that what you're saying?" to which Mr. Verdino responded, "Right. It isn't." We returned to this later in the interview (see below).

Mr. Verdino was asked what happened next. He responded, "When I got to Dirksen, they told me what I was charged with: CP." The examiner clarified, "Q. Having child pornography?" "Yes," he responded. When the examiner inquired, "Q. You don't like to say it?" Mr. Verdino nodded affirmatively and said, "No, right." [Notably, the same use of the acronym "CP" was consistently noted in 2009 – 2011 competency reports, and Mr. Verdino offered the same explanation to the Court during testimony at the 2010 competency hearing]. The examiner asked Mr. Verdino to provide more detail regarding his arrest and detention (dates, location, etc.), the manner in which he learned about potential charges he was facing, and who "they" referred to. He was told to begin wherever he wished. Mr. Verdino explained, "So, September 2018 they did the sweep—cleaned the house out. Then I was charged on Halloween, and that's when they brought me to Dirksen and Garett Morris was there to tell me what I was being charged with." When asked if he possessed (or the home search revealed) any pornography involving individuals younger than teenagers, Mr. Verdino offered the same response he had previously: "I think it was two guys on the bed. They said I wasn't supposed to have it." [Note, Mr. Verdino did ultimately described the "Little Princess" CD relating to the recent criminal complaint, see below].

We discussed the original 2008 charges at that point. "It was 2008, I think? CP. They said it was 12 and over," Mr. Verdino explained. He clarified "they" to be "the prosecutor." He added, "I don't like to say it. I feel those kids could be my kids and it makes me feel bad." When asked when he first began viewing child pornography, Mr. Verdino said, "I don't know." Prompting did not elicit further information, other than he did not wish to offer a response ("Q. Is it that you don't remember when it was, or you just don't want to talk about that with me? A. Right, I don't want to talk about it. Q. That's fine. But just so I'm clear, you do *know* when you started looking at child pornography, it isn't that you can't *remember*, right? A. Yes, right"). Mr. Verdino was then asked when he met others looking at child pornography. He responded, "I'll tell you, no lies. I bought a computer on-line, an old one. I was going to give it to my sister, but she didn't want it. I just wanted to download music. My roommate downloaded it—'Little Princess'—onto a CD. She was 15 or so, but they made her look 10 or 12. He made two copies of it. So, when they came this second time, they found the second copy. I didn't even know it was there! It was old, left there from before." He clarified "they" to be law enforcement. When asked the reason he did not provide this information when asked about the home search (above), Mr. Verdino simply shrugged. He then stated again, "I didn't know it was there."

Of this roommate and the circumstances surrounding his (Mr. Verdino's) 2008 arrest, Mr. Verdino explained, "He had been arrested already when I got arrested. For drugs; he was in jail before. We were in my mother's house, he was renting a room, and my sister lived upstairs. A couple of years he was there, 1989 to 2008. My sister's ex-husband met him in jail. He was on

parole, the parole board begged and pleaded with her to take him at her house." He clarified "her" to be his mother, and went on, "He was the one who knew computers, not me…My roommate was actually playing that video in front of other guys—she was with a guy called 'Mr. X'." He clarified this was a reference to the 'Little Princess' video and continued, "My sister saw him watching it. She said, 'That's messed up, he should be arrested.' But she never called the cops." When asked what was illegal about his roommate watching the "Little Princess" video, Mr. Verdino said, "It's CP. You can't have it." When asked whether he had considered reporting his roommate to police at the time, Mr. Verdino shook his head and said, "No, I didn't want the cops involved in it." When asked the reason, he said, "He had been arrested already." When asked why this mattered, he explained, "He would've been in trouble, he was on parole. And I didn't want the cops involved." When asked if he had been concerned he may also be arrested, Mr. Verdino said no, but would not explain the reason despite prompting, including questions regarding ownership of the computer versus someone else's use of it to download illicit pornography. "I just know I wasn't supposed to have it," he said, "But he's the one that downloaded it. *He* knew computers."

Mr. Verdino was asked again the reason his probation officer had concerns about him to begin with, concerns that ultimately led to the more recent 2018 search of his home by law enforcement. He explained, "I was on probation, I was just allowed to record music from TV or radio, not the computer or internet. So, I did that for a while." At this point Mr. Verdino was asked to explain his understanding of other release conditions in place at the time. He offered, "No phone with internet. I could have a phone, just not a smart phone; the Government wants me to be stupid." He went on, "They took it from me that day—I bought it at Walgreen's for $10, it was just a flip phone. I never broke rules."

The examiner inquired, "<u>Q</u>. I thought there were some violations?" to which Mr. Verdino responded, "Yes, but I only had an FM radio on my phone. I didn't do nothing wrong—she violated me for having Direct TV receivers. They weren't even hooked up! She found them in a TV cabinet when she came over." Mr. Verdino clarified "she" was a reference to his probation officer, and then admitted he had in fact used the receivers: "I *did* hook it up, but I just watched cartoons; I would record cartoons from Boomerang so I could watch them later—that was at my mother's house." The examiner prompted Mr. Verdino to clarify these statements, and he again admitted he had installed and used the receivers *at his own home* to watch cartoons. The reference to taping cartoons was unrelated, other than he was also violating terms while at his mother's house (access to restricted/paid TV channels at her home). Of this he explained, "I'd stay at my mother's house and watch her TV; I wasn't supposed to, but I was just watching cartoons." He spontaneously began discussing the history of having to move from her home: "Then I had to move to a new house because a daycare moved in near my mother's house. So about five years ago I moved to a new house. And that's where it happened. I *did* have HBO, but I didn't know I couldn't have that. The P.O. started making a big deal of that, so my mother had it turned off."

When asked what he thought his probation officer's concern was about having HBO, Mr. Verdino responded, "She was just mean" and would not expand, despite several prompts. The examiner then asked, "Why do *you* think you couldn't have cable channels like HBO?" He responded "I don't know" twice, but when prompted a third time by the examiner ("<u>Q</u>. Mr. Verdino, you don't know why you aren't allowed to have access to paid cable channels like HBO?") he replied in a loud voice, "It would be $15 'On Demand' to watch porn, and I wasn't going to watch that! I only knew I couldn't have internet, computer or smartphones. I never knew cable or satellite TV was a problem—it wasn't in the original agreement. Then she [probation

officer] added it—she just wanted to make trouble for me. Even my mother said, 'You better watch it, she's out for your ass'." When confronted by the examiner about the *purpose* of internet/computer/paid TV restrictions, Mr. Verdino calmed down and responded calmly, "No porn." However, he again insisted that despite having *access* to pornography through HBO, he was only interested in watching cartoons: "I wasn't going to pay to watch porn, I just want to watch cartoons. I didn't do nothing wrong." When asked how his therapist (Ms. Stanbary) had addressed violation issues with him in counseling sessions (e.g., possessing smart phones and cable receiver equipment, watching restricted television at his mother's, etc.), Mr. Verdino responded, "My counselor said it too! She told me, 'If you have anything in your apartment, you better get rid of it'." When asked to explain, Mr. Verdino seemed to suggest she sympathized with his mother's sentiments and felt the rules were excessive (as opposed to encouraging him to abide by release conditions).

We returned to discussing the 2018 criminal complaint at this point. The examiner asked, "Q. So, are you being re-charged with possession of child pornography?" "Yes," Mr. Verdino responded, "Like recharging a battery. How do you get charged twice for the same thing!?" He shook his head in frustration. When asked if he understood the difference between a criminal complaint versus formal charges being made in his case, he said he did not: "I just know those are the charges, what they say I did, and the case is on hold." He initially clarified "on hold" to mean "The lawyer don't want me to be in jail—at the MCC. There are bedbugs in the mattress, and I seen bad things there. In 2008-2009 I was there for nine or 10 months, then they sent me to Butner." But when asked again Mr. Verdino explained, "On hold because there are some things I don't understand about the Court. Why should I have to be in trouble for something someone else did? My lawyer says, 'In *your* possession.' But why should I have to *go to jail*?" When the examiner inquired, "Q. But you do understand *why* you may be charged with possession of child pornography?" Mr. Verdino said, "Yes. In my *possession*. But it's not fair. I'm not into that stuff, to be honest. I just want to listen to music and watch cartoons, and they took it all. So, all I can watch is what I get with an antenna, so it doesn't cause me no trouble."

When asked if he has discussed with Mr. Morris how best to move forward, Mr. Verdino replied, "I want the Government to just leave me alone; drop the charges and take this ankle bracelet off so I can go grocery shopping with my mother. She's 83." When asked again he said, "How do you get charged twice with the same thing?" When asked, "Q. So you're saying this is a defense you are considering?" Mr. Verdino replied, "Yes. That stuff was there from before." He clarified "stuff" to be videotapes seized from his apartment containing child pornography. The exchange continued: "Q. So if you wanted to use that as a defense to charges of possessing child pornography, what would you do? A. Tell them at a trial (clarifying "them" to be "the prosecutor"). Q. So tell me how this would work—the trial. Who would be there, and what would you do, etc. A. You show how it was there before and that you didn't do nothing wrong. Q. Who does that? A. My attorney. Q. Could you talk to the jury too if you want? A. Yeah. Q. Do you have to? A. No. Q. And the prosecutor, what will Ms. Mignanelli do? A. They try to say you did do something wrong. Q. Are they lying, or do they really think you having those tapes at home is wrong? A. They think it's wrong, but I don't. I didn't even know it was there! Q. Can the prosecutor ask a witness to talk to the jury? A. Like the cops? Yeah. Q. Can you ask someone to talk to the jury if you want? A. You mean like my attorney? A. No, a witness, someone who knows about your case and could talk to the jury to help them see your side of things. A. Yeah. Q. Who would you ask to be a witness for you? A. Maybe my mother. Q. And who listens to all of this and decides if you did something wrong or not? A. The jury. Q. And if you're found

4

Guilty? <u>A</u>. Maybe I could go to jail. <u>Q</u>. Who decides that? <u>A</u>. Judge Gottschall. <u>Q</u>. And if a jury says you're Not Guilty? <u>A</u>. You go home."

Mr. Verdino was asked if he *had* to go to trial. "<u>A</u>. No, we can do a plea agreement," he replied. When asked if a plea agreement had been offered, he said, "Not yet, because the case is on hold. For the Court stuff." By "Court stuff" he clarified, "It's like 2008-2009; they sent me to Butner to try to restore competency to stand trial." He was asked, "<u>Q</u>. What does it mean when someone is not competent to stand trial?" "<u>A</u>. I didn't understand everything about the Court then," he replied, adding, "Mr. Morris said he'd rather not talk about the case right now, we can talk about it when we get through *this*," a reference to the examination. Mr. Verdino said he likes Mr. Morris very much and has no concerns about him being able to help: "I like Mr. Morris; he's great. I like his personality, he's very nice. He's nice to talk to. We talk music and stuff like that." He denied ever withholding information from him.

At this point Mr. Verdino was asked to explain his understanding of the 2008 case for the examiner, including sentencing, conditional release restrictions and what led to his current status. He explained, "So, I was charged with CP in the last case. I said 'Guilty' and took a plea bargain. The sentence was probation plus no internet, computer or smartphone. I got five years to life." Asked to explain "five years to life," he clarified, "After five years, they could continue it. I thought it was senseless; five years was enough." When asked his thoughts on the reason his probation was extended, Mr. Verdino said, "I don't know. You'd have to talk to Judge Gottschall and the attorney about that." He insisted he did not know when asked again and stated, "No!" in a loud voice when asked if there had been any violations of post conviction release conditions during the first five years (beginning 11/30/11). Mr. Verdino then added, "Only when Dana came over; she was the last P.O., *after* five years. I didn't have problems with any of the four P.O.s before her. They were real cool; they just asked if I had contact with minors, viewed pornography, had any thoughts of doing stuff to kids, just some stupid questions." When asked the reason he felt these questions were stupid, Mr. Verdino responded, "Those kids are so vulnerable, stupid stuff happens to them, it's terrible. I see 'Missing and Exploited'—that means pornography." He was asked his thoughts on whether it was a child's fault for becoming involved in pornography. "<u>A</u>. The ones who force them to do it, it's *their* fault," Mr. Verdino responded, "They tell these kids, 'I'm going to kill your cat, or your parents'. I put myself in their in their position and I'd be scared."

Mr. Verdino was asked about his legal options ("<u>Q</u>. So what are your legal options at this point?"). "<u>A</u>. Pleading guilty, and being sentenced to probation," he replied. He was asked, "<u>Q</u>. Are there other options besides pleading guilty?" "<u>A</u>. Trial," Mr. Verdino responded, "But I want probation." He was asked if a sentence of probation is guaranteed. "<u>A</u>. I don't think there's a guarantee," he said. He was asked if he knew the worst possible sentence he might face. "<u>A</u>. I could go to jail, and I'd get my ass kicked by inmates and C.O.s every day," he replied. The question was reposed, emphasizing potential duration of incarceration. He explained, "Justin wants to give me 20 years!" Mr. Verdino clarified, "He's someone in Probation. I think—he's a pretrial officer, an old guy with gray hair. He doesn't look too happy; the way he talks, his face." He went on, "I can't do no 20 years. Do you know how old I'd be when I get out? With my Diabetes I don't think I'd even live that long. I already went through 13 months in jail and I can't do that—63 years old is a senior citizen now. I'm afraid my Mom's going to go, or I will. I just want to stay at home with my beloved cat. She's 14 now, I don't know how long she has. I just want to stay home and listen to my music and take care of her, not go out."

When asked his understanding of whether the Government had recommended a sentence to the Court, Mr. Verdino said, "Not yet." He was asked if it was his understanding that he is facing a possible incarceration of 0 to 20 years, to which he responded with a non sequitur: "There's a show I used to watch—Law and Order, and Lock Up-Kentucky and other States. They do interviews with inmates, and some get really mad. You know what the guys at MCC would do when they were p.o.'d at the Government? They'd put manure all over the wall." He was refocused ("Q. How are sentences decided?"), to which he responded, "I don't know." He was asked the types of things that might be considered in his own case, to which he replied somewhat indirectly: "I hope they don't consider dangerousness," he began, then inquired of the examiner, "Do you think I'm dangerous?" Mr. Verdino was asked why he was raising the issue of dangerousness, to which he again would not offer a direct response: "I just think I'm not guilty. Why should I have to take the heat for something I didn't do?"

We discussed alternatives to pleading guilty at this point ("Q. If you don't want to plead guilty, what could you do?"). "A. There could be a jury trial I guess," he replied. He was asked his understanding of how a jury trial works. He explained, "Six could say no to Guilty, six could say Guilty—that would be a hung jury, a tie." He responded "Yes" when asked if all 12 jurors had to agree for a defendant to be found Guilty of charges he is facing, and added, "It could be Hispanics, Whites, Blacks, men, women on the jury." Mr. Verdino smiled when the examiner complimented him on his knowledge of the concept of a "hung jury". However, he then began to claim a lack of knowledge about the concept of juries and the unanimity required in its decisions. Similarly, despite having just described 12 individuals that comprise a trial jury, he then said it was 12 to 15, and repeatedly claimed "I don't know" in response to further questions about unanimity (e.g., "Q. You mentioned a tie happens when six people think a defendant is Guilty and six think he's Not Guilty; what if nine jurors think the defendant is Guilty and three think he's Not Guilty?...What if all but *one* juror says the defendant is Guilty—11 jurors say he's Guilty, but one juror says Not Guilty, what would happen then?"). At one point Mr. Verdino nodded affirmatively when asked directly if all jurors had to agree a defendant were guilty for a conviction to be obtained, but again stated, "I don't know" when asked to respond with a Yes or No. The sudden contradictory information and "I don't know" responses came across as noncredible/uncooperative.

Mr. Verdino named Judge Gottschall as presiding over his case and denied concerns about her: "I think she's a very nice lady and she's looking out for my best interest. She's been fair." He similarly denied concerns about Mr. Morris. When asked about "the Prosecutor," Mr. Verdino said, "Esther. I'm scared of her, like Dana." He denied any concerns about collusion between the attorneys or the Court. He commented spontaneously, "I got a new P.O. a couple of months ago, by the way." When asked to explain, he responded, "I know the Government thinks she gives everyone a hard time." He clarified "she" as a reference to Dana. He went on, "I saw her at Court giving another guy who works at a flea market a hard time." He explained this was how he knew Dana wasn't specifically focused on hurting him, *per se*, but that she was "hard" in general. He then added, "I'm really scared to go to jail."

Mr. Verdino described the purpose of a trial as, "The Prosecutor tries to make the guy look bad in front of the jury." When asked how a defense attorney fit in, he replied, "He says, 'What the other guy said isn't true; he tries to make him look good." When asked about other roles of a defense attorney, he offered, "He tries to get him out of trouble, get him to stay home, maybe have an ankle bracelet." When asked if a defense attorney sometimes speaks to a prosecutor, Mr. Verdino said, "Yes, I've seen them do that." And when asked his understanding of the reason they

might do so, he said, "To come up with an agreement. Maybe to stay out of jail." When asked the reason a prosecutor might offer a defendant a plea agreement, Mr. Verdino said, "So you're guilty," and could not think of other benefits to the Government. He said, "You could stay out of jail maybe," when asked why a defendant might agree to plead guilty as part of a plea agreement, adding, "And no trial." When asked why a defendant might choose a trial over a plea agreement, Mr. Verdino responded, "Maybe a jury says you aren't guilty and you get to go home." When asked if it could turn out a defendant got a "worse sentence" than what is being offered in a plea agreement, Mr. Verdino said, "Yes!" The following exchange then occurred: "Q. Do you have to choose a plea agreement if the prosecutor offers one? A. No. Q. What else could you do? A. I can go to trial. Q. Is this your decision, or Mr. Morris's decision? A. Well, he wants to help me. A. [sic] But what if you wanted to go to trial and he wanted you to sign a plea agreement? Do you have to do what he says? A. I guess not. But he wants to help me. Q. So you trust his advice? A. Right."

Mr. Verdino was asked about possible sentences and release conditions if a defendant were found Guilty but not sentenced to "jail." He began with a general response, quickly turned to his own case, and at times made inappropriate remarks. He stated, "Community service, like shoveling snow, and they don't ask for money, they work for no money. A promise to stay away from all pornography. Keep your apartment clean. I hope they don't ask me to stand in the street holding a sign that says 'Sex Offender'." The examiner asked if he was making a joke. "No!" he responded, "I saw that on TV." He continued, "Could I listen to music over the internet? Is there a way—like Parental Controls? No porn, violence or nasty things. A sign would come up and say, 'Sorry, website not available at this time,' something like that?" The examiner responded she did not know if that existed, but told Mr. Verdino it was positive of him to think in this manner (he smiled). He was asked about registering as a sex offender. "I'm already registered," he responded, "I've been registered since August of 2010 when I was convicted. I re-register every August 15th. I'd keep registering if it kept me out of jail."

When asked to describe his concerns about going to trial, Mr. Verdino said, "I might be found guilty." He was asked what he thought it might be like to go though a trial. He replied, "The Prosecutor would talk bad about me, the Defense Attorney would say, 'No, he's not like that,' and then the jury would have a vote and say Guilty or Not Guilty." Asked if he were willing to go through this, Mr. Verdino said, "No! I don't want a bunch of people hearing what I'm charged with, it's embarrassing!" When asked if there were circumstances under which he would choose to have a trial anyway, he was quiet. When asked "Q. If the Government said they were unwilling to give you probation, and insisted on jail time, would you go to trial?" Mr. Verdino replied, "Well, of course! I'd have no choice!" He was pushed on the meaning of having no choice. "Yes, of course. I know I don't have to" he said, "But I *can't* go to jail." In response to further inquiries regarding *choice* to have a trial versus accept a plea agreement requiring jail time, he said, "Yes, I don't *want* to go to jail" and "Yes, I would do a trial if I *had* to." He was speaking loudly at this point and appeared agitated. We returned to the topic later.

Mr. Verdino understood that plea agreements between defense attorneys and the Government were not guaranteed, but said, "The Judge usually follows what the Government says." He was again challenged ("Q. Are there times when a Judge *does* decide to give a different sentence than the prosecutor wants?"), to which he replied, "Yes. Maybe the Judge thinks the defendant shouldn't have to go to jail and lets him stay home." When asked, "Q. Is it possible a Judge could think a sentence was *too light* and give a defendant a harsher sentence than the prosecutor is asking

7

for?" he said "Yes." The examiner followed, "Q. So, if your attorney, Mr. Morris, and the prosecutor, Ms. Mignanelli, came up with a plea agreement that they both liked, and it didn't require you to go to jail, is it possible Judge Gottschall won't like that agreement and sentence you to jail anyway?" Mr. Verdino looked down and appeared anxious. "A. She could," he said. He was asked to explain further ("Q. Just so I'm clear, she could *what*"). "A. She could say I have to go to jail even if my attorney says I shouldn't," he replied. He was asked "Q. And if Ms. Mignanelli, the prosecutor, also says you shouldn't go to jail, the judge could sentence you to jail anyway?" to which he replied "A. Yes, even if she says that," adding "I never heard of a judge giving a different sentence," clarified to mean different from what had been recommended in a plea agreement. He was asked again if he believed it *could* happen. "A. *You* say it can," he responded sarcastically. He was asked if he thought it might happen in his case. "A. I hope not," he said.

At this point Mr. Verdino spontaneously stated, "Anyway, I don't think I'm guilty just because someone put something in my mailbox." He was asked what he was referring to, and these follow-up inquiries indicated Mr. Verdino was taking issue with the concept of illegal *possession*. "It's just an example… Like if someone steals 10 dollars from someone's house and puts it in my house, and they find it, am I guilty? Or if someone sends you something over the internet, a bad picture, and you download it, why is that your fault? It's not fair. You didn't ask them to do that, but now because it's in your possession you're in trouble." He was asked if he was referring to having been found guilty in the 2008 matter, to which he said yes. "Q. You still feel you didn't do anything wrong?" he was asked. "A. Well, I had pictures. But it's not fair," he replied. Mr. Verdino was asked the reason he decided to plead guilty at that time if he believed he wasn't. "A. I think I did," he said, adding, "The judge just said, 'Time served' and I could go home." He was challenged, "Q. Didn't you plead guilty?" to which he replied, "Oh right, I did. And she just gave me a sentence." We did not discuss the issue further.

Mr. Verdino was asked what another outcome of a trial could be besides a Guilty verdict. "A. I could be found Not Guilty, right," he replied, adding, "I guess the charges would be dismissed" when asked what would happen if that occurred. When asked to define a bench trial, Mr. Verdino offered, "Isn't that when a judge decides if you're guilty?" He was asked if he had considered a bench trial in his own case. "Mr. Morris talked with me about that when I first got busted," he said, clarifying this related to the 2008 matter. He reiterated that current strategic decisions were on hold pending the outcome of the competency issue. Despite accurately describing some relevant facts and concepts related to bench versus jury trials, Mr. Verdino refused to describe benefits and drawbacks of either approach. He said simply, "One versus 12" and shrugged. When offered a hypothetical about a bank robber, he acknowledged that "Making 12 people believe he did it is harder than convincing one person," and that "If not everyone in the jury thinks he's guilty he would go free," but would not describe such concepts more generally when asked directly (e.g., "Q. So, you're saying choosing a jury trial would be better for this bank robber than a bench trial?" "A. I don't know. I don't think so" and later, "There's no difference"). Multiple follow-up inquiries did not change his response, and unlike during other aspects of the interview, Mr. Verdino's failure to reconcile these inconsistent statements did not appear intentional. Further discussion revealed he felt either trial approach in his own case was a moot issue: "There is nothing better, either one. The prosecutor is persuasive," he repeated several times.

Mr. Verdino was asked about a defendant's right to testify at their own trial. "A. I'm not sure; would it make a difference?" he replied. He said "I could" when asked again, but when asked if he would want to, "I don't know…it would be embarrassing." When asked if he would choose to

testify if he thought it would help his case, Mr. Verdino said yes. He was asked his thoughts about having his case discussed in front of a jury versus Judge Gottschall alone in a bench trial. He said this didn't matter ("A. I'm still embarrassed"). When asked if being embarrassed by his charges would keep him from choosing to go to trial if he thought it was the best approach, Mr. Verdino shook his head and said, "No. If I have to, I have to. But I don't *want* to." The examiner clarified, "Q. If Mr. Morris wanted you to testify in front of a jury at a trial, would you be able to do that?" "A. Yes" Mr. Verdino responded simply, also stating "Yes" when asked "Q. And you could testify in front of Judge Gottschall if you decided to have a bench trial and you wanted to answer some questions from her?" He knew it was his choice to offer testimony.

Mr. Verdino was asked what he would do if he became confused at some point during a trial. "A. I know I can't ask my lawyer out loud in Court, he'd say 'Shh!'" He clarified, "I do ask him questions, I just can't be loud." He said he would tell Mr. Morris if he thought someone testifying were being untruthful, and when asked what could happen if someone lied while testifying, Mr. Verdino responded, "Purgatory"? It was unclear whether this was a play on words. "Yes, perjury!" he replied when asked, adding, "He could be caught in a lie—and he just had his hand on the Bible? Oh boy." When asked if he had concerns about anyone lying in his own case, he said, "The prosecutor," but when pressed said, "No, she's not lying. Just making a big deal about it." He was asked again if he disagreed with pending charges, to which he responded, "That's right!" while nodding affirmatively in an exaggerated manner.

When asked at the end of the interview if he had any questions or wished to add anything, Mr. Verdino looked at the examiner and said in a child-like manner, "If you were a juror, would you find me guilty?" The examiner stated she was not a juror and would not be offering such an opinion to the Court, and inquired whether Mr. Verdino understood that. "A. I know, just competency," he said. Approximately 30 minutes later, while Mr. Verdino was waiting for his ride, the examiner asked if he needed anything. Mr. Verdino replied, "If you were a judge, how would you find me? Yes, I'm still thinking about it…"

Goldstein Report at 35–42 (footnote omitted).