IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| United States of America )<br> )<br>    v. )<br> )<br>Larry Verdino )<br> )<br> ) | Case No. 08-CR-0653<br><br>Honorable Joan B. Gottschall |

## MEMORANDUM OPINION AND ORDER

    This seventeen-year-old criminal case, closed since 2023, comes before the court on defendant Larry Verdino's motion for a writ of error *coram nobis*, seeking to set aside his 2011 guilty plea to a charge of receiving child pornography. *See* 18 U.S.C. § 2252(a)(5)(A) (2006). Mr. Verdino received an agreed prison sentence of time served and a lifetime term of supervised release. In 2023, on defendant's motion, with the agreement of the Probation Office and without objection from the government, Mr. Verdino's supervision was terminated. *See* Order dated Feb. 13, 2023, at 1, ECF No. 228; Gov't Mem. 1–2 (Feb. 10, 2023), ECF No. 226; Minute Entry 1 (Jan. 27, 2023), ECF No. 221.

    Most of the history of this case is summarized in prior orders and opinions. *See United States v. Verdino*, 2021 WL 4264504, at *2–15 (N.D. Ill. Sept. 20, 2021) ["*Verdino II*"]; *United States v. Verdino*, 2010 WL 1979428, at *1–5 (N.D. Ill. May 14, 2010) ["*Verdino I*"]. Twice the court held full evidentiary hearings on the subject of Mr. Verdino's competency. The first time, it ruled that Mr. Verdino was not competent to stand trial under *Dusky v. United States*, 362 U.S. 402 (1960). *Dusky* holds that "[a] defendant is competent if he 'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and . . . 'has a rational as well as factual understanding of the proceedings against him.'" *Verdino II*, 2021 WL 4264504, at *1 (quoting *Dusky*, 362 U.S. at 402). The second opinion made a preliminary judgment of incompetency, pending the government's explanation of how it believed

Mr. Verdino's intellectual limitations could be accommodated during a trial.[1]  This court remains convinced that Mr. Verdino is not, never has been, and never will be competent to stand trial under the *Dusky* standard.

Today, Mr. Verdino, age 67, lives alone in a cockroach-infested Chicago apartment.  Mot. Writ Error *Coram Nobis*, ¶ 27, ECF No. 231.  He has been diagnosed as intellectually disabled since childhood, has cerebral palsy, and now has serious physical disabilities.  *See id.*; *Verdino* II, 2021 WL 4264504, at *2; *Verdino I*, 2010 WL 1979428, at *1.  Mr. Verdino has never functioned independently as an adult.  He lived with his mother until, as a result of his criminal conviction in this case and his consequent inability to continue living at that location when a daycare center opened nearby, his mother was forced to find an apartment for him in another location.  *See Verdino* II, 2021 WL 4264504, at *9 (Citing Special Report 3 (July 11, 2014), ECF No. 106).  Since his mother, his primary caretaker, died in 2021, Mr. Verdino's sister has bought his groceries, driven him to medical appointments, and attempted to meet his other needs, such as cleaning his apartment.  *See* Mot. Writ Error *Coram Nobis* ¶¶ 27–28; Status Report ¶ 3 (Apr. 14, 2022), ECF No. 205.  Mr. Verdino uses a walker to get around his apartment, is morbidly overweight, has failing eyesight, and "has sores and loss of feeling in his feet," among other maladies.  Mot. Writ Error *Coram Nobis* ¶ 27.  Mr. Verdino does not venture out of his apartment alone, even to take out the trash.  *Id.*  He requires his sister's assistance to get downstairs to the ground level of his building.  *Id*.

For years, Mr. Verdino's sister, who would like to move from the Chicago area, has been trying unsuccessfully to place him in a residential nursing facility.  *See id.* ¶¶ 29–31.  According to Mr. Verdino's attorney, who was initially appointed to represent Mr. Verdino for his criminal case but currently represents him *pro bono*, every nursing home his sister and her doctor have approached has declined to accept Mr. Verdino as a matter of policy because he is a registered

---

[1] The second competency opinion, dated September 20, 2021, authorized the government to supplement the record to explain how accommodations it had proposed for Mr. Verdino could be practically implemented during a hearing or trial.  *See Verdino II*, 2021 WL 4264504, at *18–19.  The government did not avail itself of that opportunity.

sex offender. *Id.* ¶ 30. Mr. Verdino's federal registration requirement expires in 2026, *See* 34 U.S.C. § 30915(b)(1), but his state registration requirement, also a result of his federal conviction, is lifelong. *See* 730 Ill. Comp. Stat. 150/2(A), 150/7 (West 2025).

In asking for the extraordinary remedy of a writ of error *coram nobis*, Mr. Verdino seeks to void his conviction, framing his request as a matter of life or death. Mot. Writ Error *Coram Nobis* 14. He contends that this court fundamentally erred in 2011 when it accepted his guilty plea because a person found incompetent to stand trial *ipso facto* cannot enter a knowing and voluntary guilty plea. The government responds that the court did not err, that Mr. Verdino unduly delayed challenging his plea, and that he is not suffering cognizable ongoing collateral consequences of his conviction.

A motion or petition for a "writ of *coram nobis* provides a way to collaterally attack a criminal conviction for a person . . . who is no longer 'in custody' and therefore cannot seek habeas relief." *Chaidez v. United States*, 568 U.S. 342, 345 n.1 (2013) (citation omitted); *see generally United States v. Denedo*, 556 U.S. 904, 911–12 (2009). "The writ [of error *coram nobis*] is available only in 'extraordinary cases' when (1) there is an error so fundamental as to render the conviction invalid, (2) there are sound reasons for the petitioner's failure to seek relief earlier, and (3) the petitioner continues to suffer from his conviction." *United States v. Hassebrock*, 21 F.4th 494, 498 (7th Cir. 2021) (per curiam) (quoting *United States v. Delhorno*, 915 F.3d 449, 452–53 (7th Cir. 2019)).[2]

The court is persuaded that Mr. Verdino's request for relief is timely, and that he continues to suffer as a result of his conviction. Both his need for and inability to find a nursing home where he can be cared for have become increasingly clear, especially as the years have passed since his mother's death. It has been only within the last few years that Mr. Verdino's

---

[2] Mr. Verdino cites *United States v. Sloan*, 505 F.3d 685, 697 (7th Cir. 2007), which contains language suggesting that the petitioner's continued suffering must stem from an alleged wrongful sentence. Subsequent cases make clear that the civil disability required for the writ of error *coram nobis* can stem from the conviction, not simply the sentence. *See United States v. Delhorno*, 915 F.3d 449, 454 (7th Cir. 2019) (quoting *Clarke v. United States*, 703 F.3d 1098, 1101 (7th Cir. 2013)).

3

sister and doctor have realized that because of his conviction in this case, nursing home placement is impossible.³ This situation stems directly from Mr. Verdino's criminal conviction in this case. *Cf. Stanbridge v. Scott*, 791 F.3d 715, 720–21 (7th Cir. 2015). But while the matter is hardly free from doubt, the court is not persuaded that Mr. Verdino's guilty plea amounted to error so fundamental as to render his conviction invalid.

In May 2010, this court first ruled that Mr. Verdino was incompetent to stand trial. The governing statute required Mr. Verdino to be committed to the Federal Bureau of Prisons for four months to attempt to restore him to competency. *See* 18 U.S.C. § 4241(d). Mr. Verdino was housed in the federal medical center in Butner, North Carolina ("FMC-Butner"). *Verdino II*, 2021 WL 4264504, at *7. FMC-Butner staff initially placed Mr. Verdino in an open housing unit and enrolled him in a vocational rehabilitation program, where he was at first reported to be making good progress. *Id.* However, within a month he began to "decompensate." *Id.* His hygiene and grooming declined; he stopped changing his clothes and bedding; he began to skip meals and to stop drinking fluids; and he missed doses of his medication. *Id.* He admitted to urinating on the floor of his room at night when he could not reach a urinal. *Id.* FMC-Butner officials discussed Mr. Verdino's behavior with him. *Id.* He agreed to discontinue it, but he appeared not to grasp the seriousness of his situation. *Id.* Mr. Verdino was eventually placed in a locked ward, where he could be monitored and given support caring for himself. *Id.*

The FMC-Butner experience made clear to the court and the attorneys that any resolution of the competency issue or indeed the underlying case that required Mr. Verdino to be incarcerated risked catastrophe. Following Mr. Verdino's return to Chicago from his stay at FMC-Butner, the government and defense counsel negotiated an informal plea agreement to avoid further exposure to a carceral environment. *See Verdino II*, 2021 WL 4264504, at *9.

---

³ Mr. Verdino explains why he delayed seeking relief: "Until recently, [Mr. Verdino] had no idea that his sex offender status would prevent him from entering a nursing home. . . . He had no understanding that there might be a way to vacate his conviction. Such concepts are beyond his abilities." Mot. Writ Error *Coram Nobis* ¶ 37.

Mr. Verdino agreed to plead guilty in exchange for a recommended time served sentence plus a lifetime of supervised release. *Id.*

At the time of Mr. Verdino's guilty plea, the court was persuaded by the lawyers for both sides and by the extensive plea colloquy that took place that Mr. Verdino had a minimally adequate understanding sufficient to enter a knowing and voluntary plea. The record indicates that Mr. Verdino understood that pleading guilty would not only relinquish his right to a trial, but it would also subject him to the sex offender registration requirement; and pleading guilty would most likely spare him from further custody. *See* Tr. of Change of Plea Hr'g 18:21–25, 19:1–6, ECF No. 235-1. In addition, the court was persuaded that following the statutory requirement that Mr. Verdino, having been found incompetent, be recommitted to the Bureau of Prisons to be restored to competency (which the court had no doubt was impossible given the nature of Mr. Verdino's disabilities) would be disastrous for his physical and mental health. Thus, resolving the case by means of a guilty plea appeared at the time to be a pragmatic solution to an intractable complex of problems.

At the time of the plea, the court did not foresee, and it is reasonably certain that the lawyers did not foresee, that Mr. Verdino would outlive his mother and that his conviction would cause him to be barred from urgently-needed medical and nursing home care years later as he aged. If there is anything of which Mr. Verdino was not advised that perhaps he should have been made aware, it is this: that his plea of guilty would subject him to housing restrictions and could make it difficult or impossible for him to obtain medical and/or nursing home care. But neither side has argued, and the court is aware of no case that holds, that a guilty plea to a sex offense charge is involuntary because the defendant was not made aware of the difficulty he is likely to face finding housing or a nursing home placement if he ever needs it.[4] Were this court

---

[4] A related issue involving the sex offender registration requirement had been addressed by the Seventh Circuit prior to the entry of the guilty plea in this case; the court of appeals held, among other things, that a plea was not rendered involuntary by inadequate admonitions concerning the need to register as a sex offender because the registration requirement was a collateral consequence. *See Virsnieks v. Smith*, 521 F.3d 707, 716–17 (7th Cir. 2008); *but see Padilla v. Kentucky*, 559 U.S. 356, 365–
(continued next page)

5

ever again to take a guilty plea in a comparable case, it would seriously consider adding this issue to the plea colloquy.[5]

In addition, Mr. Gareth Morris, counsel for Mr. Verdino, submitted a typewritten statement explaining why Mr. Verdino wanted to plead guilty. ECF No. 97. This statement was signed by Mr. Verdino, who made several handwritten changes to it. *See id.* at 3, 4.[6] The court accepted Mr. Verdino's guilty plea. Minute Order 1 (Aug. 9, 2011), ECF No. 96.

The question which must be resolved is whether accepting a guilty plea from Mr. Verdino was fundamental error such that he is entitled to a writ of error *coram nobis*. The court concludes that while resolving this case with the acceptance of a guilty plea was not a perfect solution given Mr. Verdino's intellectual disabilities, his understanding was sufficient, and accepting his guilty plea did not amount to fundamental error.

Neither of the two cases Mr. Verdino cites establishes fundamental error. Mr. Verdino's first case, *Godinez v. Moran*, 509 U.S. 389, 396-98 (1993), was addressed in the 2010 competency opinion. *See Verdino I*, 2010 WL 1979428, at *5–6. "In light of *Moran*, the Seventh Circuit has made clear that while the competency test is unitary (meaning the same in varying proceedings), its application will depend on the circumstances . . . and the nature of the

---

66 (2010) (declining to endorse a categorical distinction between direct and collateral consequences of a guilty plea).

[5] The scholarly literature documents the difficulties faced by disabled registered sex offenders when attempting to obtain long-term residential medical care. *See, e.g.*, Allison Frankel, *Pushed Out and Locked in: The Catch-22 for New York's Disabled, Homeless Sex-Offender Registrants*, 129 Yale L.J. Forum 279, 279–323 (2019); Tobin A. Sparling, *Preventing Resident-to-Resident Abuse in Long-Term Care: Targeting Offenders but Missing the Mark*, 15 Marq. Elder's Advisor 55, 55–100 (2013); Mary Helen McNeal & Patricia Warth, *Barred Forever: Seniors, Housing, and Sex Offense Registration*, 22-SPG Kan. J.L. & Pub. Pol'y 317, 317–77 (2013).

[6] At the plea colloquy, Mr. Morris stated regarding his client, "And I, having a responsibility to the Court to give my views on this, have concluded that he is competent to enter this plea . . . and that he does understand it." Tr. 27:12–15, ECF No. 235-1.

6

decisions that the defendant and his lawyers have to make." *Id*. (citation modified) (quoting *Holmes v. Buss*, 506 F.3d 576, 579 (7th Cir. 2007)).

While the decision to go to trial or plead guilty implicates many fundamental rights, assisting at trial demands more cognitively from a defendant (not to speak of the lawyers) than does entering a guilty plea. The decision whether to plead guilty or go to trial can be considered and assessed in advance, with as much time for consultation and explanation as the defendant needs, well before the judge conducts the plea colloquy. The plea colloquy itself can be conducted deliberately, with opportunities for questions, explanations, and breaks. *See generally* Fed. R. Crim. P. 11(b). A guilty plea thus raises limited issues, and allows for their consideration at a much more deliberate speed, than does a trial or supervised release hearing. Mr. Verdino's written statement submitted at his change of plea hearing, ECF No. 97, as well as the plea colloquy itself, confirms that this is what occurred in this case.

The opinion in *United States v. Wessel*, 2 F.4th 1043 (7th Cir. 2021), does not alter the principle that the court must take the nature of the decision that the defendant is making into account when applying the competency standard. The defendant in *Wessel* did not plead guilty or attempt to plead guilty; a jury convicted him after a trial. *See id*. at 1048–53. The district court held three pretrial competency hearings, received expert testimony, and ruled that the defendant was competent to stand trial. *See id*. at 1047–49, 1050–51. Preferring a bench trial, the defendant attempted to waive his right to a jury trial after the second competency hearing. *Id*. at 1050. The district court did not accept his waiver, citing competency concerns. *See id*.

On appeal, the *Wessel* defendant cited *Moran* and made an argument similar to the one Mr. Verdino advances here. *See id*. at 1056. Wessel argued that the district court's rejection of his waiver of a jury trial mandated, by that fact alone, a finding that he was incompetent to stand trial because the competency standard for those two decisions is the same. *Id*. The Seventh Circuit found this argument unpersuasive, explaining that a defendant may be found competent to stand trial under *Dusky* and nevertheless fail the test for waiving the jury trial right. *See id*. at 1056–57. The Seventh Circuit expressly declined to decide the question presented by

7

Mr. Verdino's *coram nobis* application: "Even pleading guilty does not include waiving the right to be tried only when competent, because a guilty plea eliminates trial. But we make no conclusions on this question." *Id*. at 1057. In view of this express reservation of the question presented here, *Wessel* leaves the law of the Seventh Circuit where it stood when this court accepted Mr. Verdino's guilty plea. *Wessel* does not show this court erred fundamentally when it took into account the relatively less complex nature of Mr. Verdino's decision to plead guilty when it found him competent to change his plea.

There is another obstacle to the issuance of the writ Mr. Verdino seeks. It is unclear to the court that setting aside Mr. Verdino's guilty plea, and thus setting aside his conviction and returning the parties to the position they were in prior to the guilty plea, would in any way ameliorate the consequences of the conviction from which Mr. Verdino seeks relief: his inability to secure a nursing home placement. While no law of which this court is aware categorically prohibits a nursing facility from admitting a person who has been charged as a sex offender, the relevant Illinois statutes make reasonably clear why Mr. Verdino's sister and doctor have failed to find a nursing home willing to accept him.

The Illinois Nursing Home Care Act ("The Act") requires a criminal background check for "all persons aged 18 or older seeking admission." 210 ILL. COMP. STAT. 45/2-210.5(b). The Act imposes more demanding background check requirements for a person who "has been convicted of, adjudicated delinquent for, found not guilty by reason of insanity for, or found unfit to stand trial for, any sex offense as defined in subsection (c) of Section 10 of the Sex Offender Management Board Act," which includes possessing child pornography. 210 ILL. COMP. STAT. 45/1-114.01; *see also* 20 ILL. COMP. STAT. 4026/10(b), (c)(11). The Act prescribes the contents of the criminal history report the Illinois State Police must prepare, including "[a] detailed summary of the entire criminal history of the offender, including arrests, convictions, and the date of the identified offender's last conviction" and "[i]f the identified offender is a convicted or registered sex offender, a review of any and all sex offender evaluations conducted on that offender. If there is no sex offender evaluation available, the Illinois State Police shall

arrange . . . for a sex offender evaluation to be conducted on the identified offender." 210 ILL. COMP. STAT. 45/2-201.6(c)(7).

The state police must provide this criminal history report to a licensed forensic psychologist, who in turn "prepare[s] an Identified Offender Report and Recommendation." *Id.* § 2-201.6(d)–(f). After receiving the forensic psychologist's report, Illinois law gives a nursing facility several options, including excluding the applicant. *Id.* § 2-201.6(f). Mr. Verdino would be subject to a state police background check and criminal history report under the foregoing provisions of Illinois law.

Mr. Verdino at this point primarily challenges only the decision to accept his guilty plea. Setting aside his guilty plea would in all likelihood have the consequence of setting the case back to the day before the guilty plea was entered, not invalidating the underlying 2008 criminal charge. *Cf. United States v. Wilkozek*, 822 F.3d 364, 368 (7th Cir. 2016) (explaining that a petition for *coram nobis* is a continuation of the original criminal case). That would require a determination of Mr. Verdino's competency to stand trial, mandating (if the court found him incompetent, as it almost certainly would), reincarceration for the Bureau of Prisons to opine on his competency and, if necessary, attempt to restore him to competency—a futile undertaking, in the court's view, but what the statute requires. *See* 18 U.S.C. §§ 4241(d)–(e), 4246. As far as this court can see, setting aside Mr. Verdino's guilty plea would solve nothing. It would simply put all the parties back in the precise situation that led the lawyers to come up with the informal agreement for a guilty plea in 2011.

Mr. Verdino makes a conclusory request at the end of the instant motion to expunge and seal the record of his conviction. ECF No. 231 at 13; *accord* Reply 8–9, ECF No. 238. This argument is too perfunctory and underdeveloped for the court to determine whether it has jurisdiction to issue an order of expungement, let alone whether it ought to do so. *See, e.g.*,

*Greenbank v. Great Am. Assurance Co.*, 47 F.4th 618, 629 (7th Cir. 2022); *see generally United States v. Wahi*, 850 F.3d 296, 299–302 (7th Cir. 2017) (discussing expungement jurisdiction).

Mr. Verdino has not shown that a fundamental error occurred when his guilty plea was accepted. Nor has he shown that setting aside his guilty plea will achieve the goal of securing nursing home placement for him. His application for a writ of error *coram nobis* is therefore denied.[7]

Date: July 14, 2025                                             /s/ Joan B. Gottschall
                                                                United States District Judge

---

[7] The court expresses its gratitude to Mr. Verdino's counsel, Gareth Morris, who for 17 years (at times *pro bono*) has not only zealously represented Mr. Verdino but, at least informally, has acted as an advisor to the Verdino family. This has been since its inception an extremely difficult, demanding and often tragic case. Mr. Morris has at all times acted well beyond the call of duty, exemplifying the best traditions of the criminal defense bar.